IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-60587
_____


UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

ROBERT LESLIE WILLIAMS,

                    Defendant - Appellant.

          --------------------------------
          Appeal from the United States District Court
           for the Southern District of Mississippi
          --------------------------------
                    August 30, 2001

Before HIGGINBOTHAM and BENAVIDES, Circuit Judges, and LITTLE[*],
District Judge.

BENAVIDES, Circuit Judge:

     Robert Leslie Williams ("Defendant"), a former City
Councilman of the City of Jackson, Mississippi, appeals his
conviction for conspiracy to commit extortion and solicitation of
bribery payments relating to the renewal of Time Warner's
contract to provide cable television in Jackson.  Finding no
reversible error in his conviction, we AFFIRM.


                    *I.  Factual and Procedural Background*


---

     [*]     District Judge of the Western District of Louisiana,
sitting by designation.

On December 9, 1997, the Jackson City Council voted 4 to 3 to reject Time Warner's proposal to renew its cable franchise. Defendant was one of the four councilmembers that voted against the renewal. Following the December 9 vote of the city council, Sandy McKnight, a maintenance engineer for Time Warner, was contacted by two alleged conspirators, Roy Dixon and a car dealer named Robert Williams.[1] Car dealer Williams and Roy Dixon were affiliated with a local radio station where McKnight worked part-time. McKnight agreed to meet the following morning, December 13, 1997, to discuss Time Warner's cable franchise renewal. At the meeting, car dealer Williams sought McKnight's assistance in making contact with the principal negotiator for Time Warner in the franchise renewal discussions with the city. He stated that he could get the franchise renewal processes going again if Time Warner would agree to his terms – a $150,000 payment. When McKnight began to inquire about how the matter could be brought before the council again for another vote, car dealer Williams responded that he could arrange a meeting with someone who could answer such questions. Car dealer Williams specifically instructed McKnight, however, not to mention the $150,000 payment during the subsequent meeting.

---

[1] There are two men named Robert Williams involved in this case. The first is a car salesman in Jackson, Mississippi and will be referred to as car dealer Williams. The second is the defendant who, at the time, was serving as a city councilperson for the City of Jackson. The latter is referred to as Defendant. The two men are not related.

Later that same day, McKnight received a page from car dealer Williams directing him to a meeting at the dealer's office at Blackwell Chevrolet. When McKnight arrived, car dealer Williams was present along with Defendant and Dixon. McKnight inquired of Defendant how another vote of the city council could occur. McKnight, as instructed, did not mention the $150,000 payment during the meeting. However, McKnight did ask what would be required in order for Time Warner to get the contract renewal. Defendant responded that if Time Warner agreed to the car dealer's terms then Defendant was not 99%, but 100% sure that Time Warner would get a majority vote of the city council. McKnight reported the meeting to the company's division president. The president told McKnight to inform car dealer Williams that Time Warner's answer was "no." The company then informed the FBI of the meeting.

The FBI requested that McKnight call back car dealer Williams, indicate that negotiations between Time Warner and the city were going poorly, and inquire whether they could still do business. The FBI recorded the telephone call between McKnight and car dealer Williams, in which Williams repeated the essentials of the proposed agreement, including that he could deliver the needed council votes if Time Warner paid him $150,000 in cash.[2] McKnight then arranged for car dealer Williams to meet

---

[2] Specifically, car dealer Williams stated that "I can get those Hershey bars in one, two, three," and "I, then I can go ahead

3

with Agent James Barnes, undercover as the franchise director for Time Warner. Car dealer Williams, along with alleged co-conspirators Dixon and Jackson police officer Robert Love, arrived in a van at Barnes' hotel and picked him up. Defendant was not present during the subsequent van ride, in which the parties discussed car dealer Williams' proposal. During the conversation, recorded by Agent Barnes, Dixon confirmed the terms of the proposal by holding up a sign that read "$150,000."

Shortly thereafter, without explanation, car dealer Williams called Agent Barnes and told him the deal was off. The FBI subsequently arrested all of the co-conspirators, including Defendant.

In a four count indictment, Defendant was charged in Counts 1 and 2 with conspiracy and attempt to commit extortion under color of official right, in violation of 18 U.S.C. § 1951(a). In Counts 3 and 4, Defendant was charged with aiding and abetting others in the corrupt solicitation and acceptance of bribery payments, in violation of 18 U.S.C. § 666(a)(1)(B) and § 2. Counts 1 and 3 related to a potential contract pending before the City Council between Time Warner Cable and the City of Jackson. Counts 2 and 4 concerned a zoning petition for a local strip club

---

and get those two Hershey bars lining up." The discussions between McKnight and the conspirators were conducted in code. The oft-used labels "Hershey bars" and "Milky Way bars" were thinly veiled references to African-American and white members of the city council. Additionally, car dealer Williams used the terms "team players and Jackson State players."

pending before the City Council.  At Defendant's first trial, the jury was unable to reach a verdict on any of the counts and the court declared a mistrial.  The district court ordered a second trial to begin approximately two weeks later.  At the second trial, Defendant was convicted on Counts 1 and 3, the Time Warner Cable matter; he was acquitted on Counts 2 and 4.  Defendant filed a timely appeal with this Court.

## II.  *Jury Venire*

The jury for Defendant's first trial was selected from a venire drawn from the Jackson Division of the Southern District of Mississippi.  For the second trial, the judge ordered the venire drawn from the entire Southern District.  The district court's asserted reason for expanding the venire was to avoid the media intensity that had occurred in the Jackson Division during the first trial.  Defendant asserts two challenges to the district court's action: first, that his due process right to a jury drawn from a fair cross section of the community was violated; and second, that his equal protection right was violated by the expansion of the venire.  In considering Defendant's challenges, we review the district court's findings of fact for clear error and its determinations of law de novo. *United States v. Alix*, 86 F.3d 429, 434 (5th Cir. 1996).

5

### A. Due Process Challenge

Defendant alleges that the underrepresentation of African-Americans on the venire for his second trial violated his right to due process.  The Sixth Amendment and the Due Process Clause of the Fifth Amendment require that a jury be drawn "from a fair cross section of the community."[3]  *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696 (1975).  To establish a *prima facie* violation of the fair cross section requirement:

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668 (1979).  In so far as African-Americans constitute a distinctive group in the community, the first requirement of Defendant's *prima facie* case is met.  *McGinnis v. Johnson*, 181 F.3d 686, 689 (5th Cir.

---

[3] The Government suggests that Defendant has waived his Sixth Amendment/due process argument by failing to comply with the Jury Selection and Service Act, 28 U.S.C. § 1861, *et. seq.*  While Defendant did fail to comply with the Act, and thus has waived any claims under the Act, the Government incorrectly suggests that the Act provides the exclusive remedy for claims that Defendant was denied a fair cross section of the community.  The very case the Government relies upon to establish waiver, *United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977), held that statutory claims under the Act are waived for noncompliance with the required procedures, but then went on to consider separately a due process claim for denial of a fair cross section of the community.  Accordingly, even though Defendant did not move to stay proceedings as required by the Act, he can still pursue a Sixth Amendment/due process claim.

1999).  With respect to the second requirement of his *prima facie* case, Defendant offers as evidence of underrepresentation the fact that the venire selected from the Jackson Division was comprised of 51 potential jurors, 21 of which were African-American; while the venire for the second trial, selected from the entire Southern District of Mississippi, was composed of 78 potential jurors, only 20 of which were African-American.

In determining whether the venire is a fair and reasonable representation of the community, the relative compositions of Defendant's two venire panels is not relevant.  The Duren test instead focuses on whether the representation of African-Americans in the challenged venire was fair and reasonable in relation to the number of African-Americans in the community. The relevant community consisting of those individuals who are eligible to serve as jurors in the Southern District of Mississippi.  *See Brown v. Allen*, 344 U.S. 443, 474, 73 S.Ct. 397, 416 (1953) (holding that a jury list must reasonably reflect "a cross-section of the population suitable in character and intelligence for that civic duty").  Moreover, "[Defendant] must demonstrate . . . not only that [African-Americans] were not adequately represented on his jury but also that this was the general practice in other venires."  *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986); *see United States v. DeFries*, 129 F.3d 1293, 1301 (D.C.Cir.1997) ("Underrepresentation of a

7

cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the "systematic exclusion of the group" required by *Duren* . . . From a small sample size based on one venire it is difficult to determine whether the disparity is random or systemic." (citations omitted)); *Singleton v. Lockhart*, 871 F.2d 1395, 1399 (8th Cir. 1989) ("Evidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion."); *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir.1985) (holding that the *Duren* Court's use of the plural when describing "venires" from which "juries" are selected indicated that a violation of the underrepresentation element cannot be premised on underrepresentation on a single jury venire).

Defendant provides absolutely no evidence regarding the percentage of African-Americans in the community, nor the composition of other venires drawn from the Southern District. Absent evidence of the percentage of African-Americans in the community, we have no baseline against which to compare the composition of Defendant's venire. *See Duren*, 439 U.S. at 668 ("[T]he defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement."). We are therefore left to speculate as to whether 26% (20 African-Americans on the second

8

venire out of 78 persons) is a significantly low percentage of African-Americans as compared to their percentage of the eligible jurors in the Southern District.[4]  Consequently, we reject Defendant's contention that the venire for his second trial violated due process.

### B. *Equal Protection*

Defendant also challenges the selection of his venire on equal protection grounds.  "Although a defendant has no right to demand that members of his race be included on the [venire], he is entitled to require that the State not deliberately and systemically deny to members of his race the right to participate as jurors in the administration of justice."  *Alexander v. Louisiana*, 405 U.S. 625, 629-30, 92 S.Ct. 1221, 1225 (1972) (citations omitted).  Ultimately, to establish a prima facie equal protection violation a defendant must demonstrate intentional discrimination in the selection of venires.  *Alexander*, 405 U.S. at 628-29.  The necessary inference of

---

[4]  Even if we were to take judicial notice of the relevant statistics, Defendant's claim would nevertheless fail. Presumably, the benchmark community would be those individuals in the Southern District over the age of 18.  *See* 28 U.S.C. § 1865(b)(1); *Duren*, 439 U.S. at 669 n.23 (accepting census data of individuals over the age of 21).  While not the most appropriate figure, we note that African-Americans in the Southern District, according to 1997 Population estimates, constituted 31% of the population.  The disparity between 31% (in the community) and 26% (in the venire) does not violate due process.

intential discrimination, however, can arise from "[a]n opportunity for discrimination in the operation of the jury selection system, coupled with a lesser degree of underrepresentation."[5] *United States v. Fike*, 82 F.3d 1315, 1321 (5th Cir. 1996) (citing *Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225 (1972)); *see Rideau v. Whitley*, 237 F.3d 472, 484 (5th Cir. 2000).

The Supreme Court's decision in *Alexander v. Louisiana* illustrates the circumstances that constitute "an opportunity for discrimination." In *Alexander*, the jury commissioners hand-picked venire-persons from selection forms that clearly displayed the race of the prospective jurors. *Id.* at 630. Despite the good faith affirmations of the selectors, the Court concluded that the statistical underrepresentation of African-Americans coupled with the clear opportunity to discriminate resulted in an equal protection violation. *See id.* at 630 ("[W]e do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral. The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for discrimination."). The Court in *Alexander*

---

[5] A lesser degree than that required in a fair cross section claim. *Fike*, 82 F.3d at 1321.

10

analogized to two prior cases.  In the first, the judge hand picked jury selection cards; African-American candidates had yellow cards while white candidates had white cards.  *Id.* at 631 (citing *Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891 (1953)).  Again, while there was no evidence of specific discrimination by the judge, such evidence was unnecessary "given the fact that no [African-Americans] had appeared on the final jury" and the different colored note cards "'[o]bviously ma[de] it easier for those to discriminate who are of a mind to discriminate.'"  *Id.* (quoting *Avery*, 345 U.S. at 562).  In the second case, the Court reversed the conviction of a defendant tried before an all-white jury that had been selected from a tax digest which separated African-Americans and whites and placed a "(c)" next to the names of the African-Americans.  *Id.*  Despite the lack of evidence of specific discrimination, the Court held that the disproportionately low number of African-American venire-persons selected, in combination with the potential for abuse inherent in the selection process established a prima facie case of discrimination.  *Id.*

In the present case, Defendant does not allege any such opportunity for discrimination inherent in the selection process.[6]  Rather, he simply argues that "because of the district

_____

[6] Indeed, it is unlikely that Defendant would be unable to maintain such a claim.  The Southern District of Mississippi has an approved plan for random jury selection which is in compliance with

11

court's action there was not only the opportunity for a substantial degree of African American underrepresentation, there was in fact African American underrepresentation."[7]  Defendant's argument again turns the true inquiry on its head.  Under *Fike* and *Alexander*, the relevant "opportunity" is for discrimination in the jury selection process, not an opportunity or chance for underrepresentation to occur.  *See Fike*, 82 F.3d at 1322 ("Equal protection requires guards against arbitrary power in selecting venires.").  The closest Defendant gets to arguing an opportunity for discrimination is the implication that the percentage of eligible jurors that are African-American is higher in the Jackson Division than in the Southern District as a whole.  His argument follows that the district court's discretion to expand the jury venire to the district as a whole represents an opportunity to discriminate.  Even assuming we were to accept, without evidence, that the percentage of eligible African-American jurors was higher in the Jackson Division, Defendant's alleged opportunity for discrimination does not equate with the examples of discrimination recognized in *Alexander*.

Absent the inference of discrimination under *Alexander*, Defendant's equal protection claim fails.  Defendant has not

the 28 U.S.C. § 1863, et. seq.

[7] Similar to his due process claim, Defendant does not support his assertion of underrepresentation with any relevant evidence.

12

presented any other evidence indicating that the district court's decision was racially motivated.  On the contrary, the district court provided a reasonable explanation for its action – the concern that the intense media coverage surrounding the first trial may have affected the ability to draw an impartial jury from the Jackson Division.  Defendant has not offered any evidence showing the district court's reason was pretextual. Thus, Defendant's equal protection argument fails.


### III.  Batson Challenges

Defendant further argues that the alleged underrepresentation of African-Americans in the venire was exacerbated by the Government's racially selective peremptory strikes.  "The use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment." *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000); *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).  We analyze whether a peremptory strike has been exercised in a racially discriminatory manner in three steps:

> First, the [opponent of the strike] must make a prima facie
> showing that the [proponent] has exercised peremptory
> challenges on the basis of race.  Second, if the requisite
> showing has been made, the burden shifts to the [proponent]
> to articulate a race-neutral explanation for striking the
> jurors in question.  Finally, the trial court must determine
> whether the [opponent] has carried his burden of proving
> purposeful discrimination.

*Hernandez*, 500 U.S. at 358-59 (citations omitted).

Following the Government's exercise of two peremptory strikes against African-American venire-persons, Defendant's counsel raised his *Batson* claim.  The district court then asked the Government to provide a race-neutral justification for striking the prospective jurors.  Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the *Batson* analysis.  *See United States v. Broussard*, 987 F.2d 215, 220 n. 4 (5th Cir.1993) (declining to decide whether defendant had established prima facie case of racial discrimination, where district court required explanation for peremptory strikes).

The second step in the *Batson* burden shifting analysis requires that the Government provide a race-neutral reason for the strike.  *Hernandez*, 500 U.S. at 360.  We analyze the Government's proffered racially neutral explanation as a legal issue de novo.  *Hernandez v. New York*, 500 U.S. 352, 364-65, 111 S.Ct. 1859 (1991); *United States v. Bentley-Smith*, 2 F.3d 1368 (5th Cir. 1993).  "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror."  *Hernandez*, 500 U.S. at 360.  At the second stage, the explanation need not be persuasive, nor even plausible, but only race-neutral and honest.  *Purkett v. Elem*,

514 U.S. 765, 768, 115 S.Ct. 1769, 1771 (1995); *United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1999). The Government's articulated reasons for the exercise of its strikes were that one venire-person was witnessed smiling at Defendant, while the other one lived in Defendant's voting district or ward. Not being based upon race, these reasons satisfy the Government's minimal burden at the second stage. Thus, our inquiry proceeds to the third step and the ultimate question of whether intentional discrimination motivated the Government's peremptory strikes.[8]

We review the district court's conclusion on whether the peremptory strikes were racially motivated for clear error. *Hernandez*, 500 U.S. at 364. In response to the Government's asserted reasons, Defendant argued that no one else witnessed the alleged smile and that other members of the jury had also smiled at Defendant. Defendant's brief also points to the fact that the second venire-person did not actually live in Defendant's voting district. Defendant concedes, however, that this fact was not known at the time of jury selection and the Government maintains that it believed the venire-person resided in Defendant's district.

---

[8] Citing *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771 (1995), Defendant contends that because the district court failed to afford Defendant the opportunity to demonstrate that the Government's race-neutral reasons were pretextual, reversal is warranted. Defendant's contention mischaracterizes the holding in *Purkett* and is without merit.

15

"In a typical peremptory challenge inquiry, the decisive question will normally be whether a proffered race-neutral explanation should be believed. There will seldom be any evidence that the claimant can introduce – beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities." *Bentley-Smith*, 2 F.3d at 1374-75 (citation omitted). Thus, in circumstances where the Government's reason is fantastic or inconsistent with its treatment of similar non-minority jurors, we may have a basis for reversal. However, where, as here, the Government's reasons are plausible, ultimately the inquiry boils down to whether the Government should be believed. This is quintessentially a question of fact which turns heavily on demeanor and other issues not discernable from a cold record, such that deference to the trial court is highly warranted. *Id.* at 373. In light of the district court's unique position to assess the Government's credibility, we cannot find clear error in the district court's decision to believe the Government's proffered reasons.

Finally, we address Defendant's argument that we should consider the synergy between the expansion of the venire and the Government's peremptory strikes. Defendant argues that while each alleged error may not be sufficient to warrant reversal, the cumulative effect of the errors deprived him of a right to a fair

16

trial.  We have previously recognized the so-called cumulative error doctrine under which "an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial."  *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1999); *see United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir.1993) (explaining the cumulative error doctrine).  In the present case, Defendant has not established *any* error in the selection of his venire or jury.  Accordingly, we reject all of Defendant's challenges to the selection of his venire and jury.

### IV.  *Denial of Continuance to Obtain Transcript of Mistrial*

Following the district court's declaration of a mistrial in Defendant's first trial, the district court set the date for retrial 17 days later.  Prior to retrial, Defendant moved for a continuance, citing the lack of a complete transcript of the mistrial, scheduling conflicts, and other matters creating a hardship on defense counsel.  The district court denied the motion for continuance.  On appeal, Defendant alleges that the district court's failure to grant a continuance in order that he could obtain a complete transcript denied him the opportunity to obtain a fair trial.  *See United States v. Uptain*, 531 F.2d 1281, 1291 (5th Cir. 1976) (reiterating that "a scheduled trial date should never become such an overarching end that it results in

17

the erosion of the defendant's right to a fair trial."). We construe Defendant's argument as alleging a denial of procedural due process.

In support of reversal, Defendant cites several cases in which the Supreme Court and this Court have recognized the right of an indigent defendant to obtain equal access to his trial transcript. *See Britt v. North Carolina*, 404 U.S. 226 (1971); *Tague v. Puckett*, 874 F.2d 1013 (5th Cir. 1989); *United States v. Pulido*, 879 F.2d 1255 (5th Cir. 1989); *United States v. Baker*, 523 F.2d 741 (5th Cir. 1975). Defendant, in contrast, does not allege that he was denied a transcript as a result of indigence. The equal protection rationale of the cited cases is therefore inapposite. While the cited cases principally relied on equal protection, the Court has acknowledged that:

> "[t]he precise rationale for [an indigent defendant's right to a transcript] has never been explicitly stated, some support being derived from the Equal Protection Clause of the Fourteenth Amendment, and some from the Due Process Clause of that Amendment. Neither Clause by itself provides an entirely satisfactory basis for the result reached, each depending on a different inquiry which emphasizes different factors. 'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. 'Equal protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. We will address these issues separately in the succeeding sections.

*Ross v. Moffitt*, 417 U.S. 600, 608-609 (1974) (Rehnquist, J.).

Thus, it appears as if the equal protection and due process rationales are intertwined such that denying due process to

18

indigents is itself a denial of equal protection and denying equal treatment to similarly situated defendants is itself a denial of due process. *See Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Ross*, 417 U.S. at 609 n.8. To the extent, these cases reflect a right grounded in procedural due process to a transcript, the facts of Defendant's case reveal that he was not denied due process, i.e. a fair trial, by the district court's refusal to grant a continuance.

The parties agree that Defendant was given the transcripts of Sandy McKnight and Robert Love. Defendant contends that he did not receive the testimony of Agent Barnes, and did not receive the testimony of Agent Karen Szszepanski until the third day of trial. The Government, however, maintains that Agent Szszepanski's transcript was available in the clerk's office and it was due to Defendant's lack of diligence that he did not obtain the transcript of her testimony prior to trial. In any respect, Defendant possessed the testimony of Agent Szszepanski at least 24 hours prior to her testimony in the second trial. Agent Szszepanski was responsible for analyzing the telephone records of Defendant and other alleged co-conspirators in order to develop a chart summarizing the calls. Agent Szszepanski had no personal knowledge of Defendant's actions. Defendant did not have available to him at the second trial Agent Barnes' transcript of testimony from the first trial. Agent Barnes posed

as the franchise director for Time Warner.  His testimony related to the van ride he took with car dealer Williams, Dixon, and Jackson Police Officer Robert Love.

Absent his conclusory assertions to the contrary, Defendant has not alleged how his inability to obtain a complete transcript affected his right to a fair trial.  Defendant does not allege that the proceedings were particularly complex nor that any testimony from the first trial was contradicted during the second trial.  Defendant was represented by the same counsel at both trials.  As our review of the sufficiency of the evidence below reflects, the principal witnesses against Defendant were Sandy McKnight and Robert Love (Robert Love also testified about the van ride).  The Defendant possessed prior to trial the transcripts of both of these witnesses.  Further, there was no dispute at trial with respect to the facts and circumstances related to the van ride.  The Defendant did not complain that the statements and actions attributed to Love and car dealer Williams during the van ride were not made or false; rather, the Defendant contended that car dealer Williams and Love were involved in an extortion scheme but he was not a part of the scheme, pointing out that testimony showed that he was not present during the van ride.  Under the circumstances presented here, we find no merit in Defendant's claim that his due process rights were violated.

### V. Evidentiary Challenges

Defendant presents several challenges to the evidence admitted during his second trial.  We review the district court's evidentiary rulings for abuse of discretion.  *United States v. Ramirez*, 174 F.3d 584, 589-90 (5th Cir. 1999).

### A. Telephone Records

Through its expert, Agent Szczepenski, the Government introduced a summary chart detailing telephone calls between Defendant and other alleged co-conspirators.  The exact nature of Defendant's challenge to this evidence is unclear.  However, Defendant appears to argue that the chart should not have been admitted into evidence or, in the alternative, that the chart presents insufficient evidence to support his conviction.  Initially, Defendant correctly cites *United States v. Galvan* for the proposition that telephone records are insufficient evidence to support a conspiracy conviction unless the government can show who participated in the calls and the substance of their conversation.  693 F.2d 417, 419 (5th Cir. 1982); *United States v. Powers*, 168 F.3d 741, 746-47 (5th Cir. 1999).

*Galvan*, however, did not hold that telephone records are inadmissible absent such a showing.  693 F.2d at 419-20.  Thus, even if we credit Defendant's argument that the Government cannot prove who made the calls or what their content was – the

Government disputes this contention – that does not render the evidence of the calls inadmissible.  All relevant evidence is generally admissible; and to be relevant, evidence need only make the existence of a material fact "more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401 and 402.  Evidence that telephone calls were made between phones owned by Defendant and other alleged conspirators, at times consistent with the events alleged to be part of the conspiracy, makes the existence of the conspiracy, and Defendant's participation in it, more likely.

Moreover, in the present case, unlike *Galvan*, the Government did not rely exclusively on the telephone records to support its conspiracy case.  The addition of other relevant evidence supporting Defendant's conviction removes this case from the limited holding in *Galvan* that telephone records are not, standing alone, sufficient evidence to support a conspiracy conviction unless the government can show who participated in the calls and the substance of their conversation.  Accordingly, Defendant's argument regarding the admissibility and sufficiency of the phone records is without merit and rejected.

Finally, Defendant argues that the summary charts prepared by Agent Szczepenski should not have been admitted without an instruction that the charts were merely jury aids, not evidence. Because Defendant did not raise this objection before the

district court we review it for plain error.  Plain error is "1) an error; 2) that is clear . . .; and 3) that affects the defendant's substantial rights."  *United States v. Izaguirre-Losoya*, 219 F.3d 437, 441 (5th Cir. 2000); *see United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 1775-79 (1993).  A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed.  *United States v. Smyth*, 556 F.2d 1179, 1184 (5th Cir. 1977).  Such charts are distinguishable from pedagogical aids, which are merely to assist the jury in understanding the evidence and should be accompanied by an appropriate limiting instruction.  *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985).  In the present case, the summary charts were entered into evidence pursuant to Rule 1006 and thus no instruction was needed.  Finding no error, we reject Defendant's claim that a jury instruction was necessary.

### B.   Financial Condition

Relying on two Ninth Circuit cases, Defendant argues that the Government's evidence concerning his financial condition was impermissibly offered to show "the mere fact that [he] is poor."  *United States v. Bensimon*, 172 F.3d 1121, 1129 (9th Cir. 1999); *United States v. Jackson*, 882 F.2d 1444, 1449 (9th Cir. 1989).  In the present case, the evidence admitted was testimony from a

Government witness that Defendant had recently lost his home in a sale. Testimony regarding a specific change in Defendant's financial circumstances goes beyond showing "the mere fact that he is poor." Such testimony is relevant to Defendant's motive and therefore admissible under Rule 404(b). *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991). Further, the district court did not abuse its discretion in concluding, pursuant to Rule 403, that the probative value of the testimony was not substantially outweighed by its prejudicial effect. Thus, the district court did not err in admitting the statement concerning Defendant's financial condition.

### C. Prior Consistent Testimony of Robert Love

Defendant correctly asserts, and the Government apparently concedes, that the district court erroneously admitted the prior testimony of Robert Love under Rule 801(d)(1)(B).[9] On cross-examination, Love was impeached with evidence that he negotiated a deal with the Government to testify. To rehabilitate its witness, the Government introduced Love's testimony from the first trial. The Government based its admission of the evidence

---

[9] Rule 801(d)(1)(B) of the Federal Rules of Evidence provides that a statement is not hearsay if (1) [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

on Rule 801(d)(1)(B).  However, because the motive for Love to lie arose prior to his testimony in the first trial, the testimony was inadmissible under Rule 801(d)(1)(B).  *Tome v. United States*, 513 U.S. 150, 160 (1995); *see United States v. Powers*, 168 F.3d 741, 750 (5th Cir. 1999) (holding that "admitting statements under Rule 801(d)(1)(B) that were made after the time the motivation to fabricate arose constitutes error.").

Defendant's objection to the admission of the prior consistent statement generically asserted that "Rule 801(d)(1)(B) does not apply."  We find Defendant's general objection was not "specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue raised."  *United States v. Burton*, 126 F.3d 666, 672-73 (5th Cir. 1997).  In this regard, we note that the temporal requirement imposed by *Tome* and *Powers* is not found in the text of the rule.

Since Defendant did not adequately object, we review the issue for plain error.  *Id.* at 673.  Plain error is "1) an error; 2) that is clear . . .; and 3) that affects the defendant's substantial rights."  *United States v. Izaguirre-Losoya*, 219 F.3d at 437.  Although introduction of the prior consistent statement was an error; that was clear; such introduction did not affect Defendant's substantial rights.  Robert Love's testimony was not a critical lynchpin holding together the Government's case, and

25

the prior consistent testimony merely reiterated the testimony Love had just given on direct examination. We therefore find no reversible error.

### D. *James Hearing*

Defendant asserts that the district court erred in failing to conduct a *James* hearing and not providing a finding on the record that supported the court's admission of the alleged co-conspirators' statements into evidence under Rule 801(d)(2)(E).[10] In *United States v. James*, this Court held that co-conspirators statements are admissible under the hearsay exception in Rule 801(d)(2)(E), only if substantial independent evidence of a conspiracy exists. 590 F.2d 575, 581 (5th Cir. 1991). We then outlined permissible methods by which a district court may determine whether the predicate elements exist to warrant admitting the statements. A *James* hearing, conducted outside the presence of the jury, is one potential method by which the district court may ensure the Government can satisfy the predicate facts needed to prove the conspiracy independent of the statements. *United States v. Fragaso*, 978 F.2d 896, 900 (5th Cir. 1992). Whether a *James* hearing is necessary in a particular

---

[10] Defendant does not challenge the district court's conclusion that the requirements of Rule 801(d)(2)(E) were satisfied, only that the district court did not follow proper procedure in reaching its conclusion.

case in within the discretion of the trial court. *Id.* In the instant case, Defendant was being retried before the same judge on the same charges. In an analogous case, we found the district court, which had presided over the trials of a defendant's co-conspirators, committed no error in refusing to conduct a *James* hearing. *United States v. Ricks*, 639 F.2d 1305, 1310 (5th Cir. 1981). Similarly, having heard all the relevant testimony previously, the district court in this case did not abuse its discretion in finding that the requirements of Rule 801(d)(2)(E) were satisfied without a *James* hearing.

## VI. Sufficiency of the Evidence

Defendant's final challenge is to the sufficiency of the evidence supporting his conviction. In our review of the evidence we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); *United States v. Pena*, 949 F.2d 751, 755 (5th Cir. 1991). We have recognized that the jury is "free to choose among all reasonable constructions of the evidence," *United States v. Garcia*, 86 F.3d 394, 398 (5th Cir. 1996), and "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with

27

every conclusion except that of guilt." *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999). Our review is thus limited to whether the jury's verdict was reasonable, not whether we believe it to be correct. Finally, "[t]his standard of review is the same regardless of whether the evidence is direct or circumstantial." *Lage*, 183 F.3d at 382.

To prove the elements of conspiracy, "[t]he government must prove beyond a reasonable doubt that a conspiracy existed, that the defendant knew of the conspiracy, and that, with that knowledge, he voluntarily became part of it. However, the government need not establish its proof by direct evidence. Proof of a conspiracy may be established by circumstantial evidence and may be inferred from concert of action." *United States v. Graves*, 669 F.2d at 969 (citations omitted). Defendant's challenge to the sufficiency of the evidence focuses on whether the Government proved beyond a reasonable doubt that he had knowledge of the conspiracy. Defendant points to the fact that no one that testified at his trial had direct knowledge of his involvement in the conspiracy. He further argues that all of the circumstantial evidence linking him to the conspiracy is as consistent with innocence as it is with guilt.

The primary evidence implicating Defendant in the conspiracy consisted of telephone records between Defendant and several alleged co-conspirators; testimony and recordings of

28

conversations between McKnight, Love, and the alleged conspirators; and the testimony of McKnight regarding his meeting with Defendant at the car dealer's office on December 13, 1997.

The Government's theory at trial was that car dealer Williams acted as a "bagman" for Defendant, ensuring that he would be distanced from any discussions or transfer of the bribery payment. Defendant argued that he was unaware of car dealer Williams' attempts to extort the $150,000 payment and that he was only interested in ensuring greater minority participation in Time Warner's renewal proposal. However, when McKnight had questions regarding the council's vote, car dealer Williams immediately called Defendant and arranged for a meeting to occur that afternoon in his office.

In that December 13 meeting, Defendant stated that Time Warner could be 100% sure of getting a favorable revote on their cable franchise proposal if they agreed to "the car dealer's terms." Previous testimony had established that the car dealer's terms were "$150,000." Defendant contended, however, that he believed the meeting at the car dealer Williams' office was to discuss greater minority participation, which he understood to be "the car dealer's terms." The meeting was held on a Saturday in car dealer Williams' office at Blackwell Chevrolet. McKnight was Time Warner's representative in the contract discussion, he was a maintenance engineer. McKnight testified that following the meeting, car dealer Williams stated that Defendant was nervous

29

that McKnight was wired because McKnight never took his jacket off during the meeting.  Given these facts, it was not unreasonable for the jury to infer that Defendant was referring to the $150,000 payment when he alluded to "the car dealer's terms."

Additional testimony came from Robert Love.  Love testified to his conversations with car dealer Williams, in which car dealer Williams made numerous references to soliciting the vote of Defendant.  The jury also listened to the recorded telephone conversation between McKnight and car dealer Williams and the recorded conversation Agent Barnes had with the conspirators in the van.  These conversations confirmed that the votes of the "Hershey bars" were conditioned on the payment of the $150,000.  The jury could reasonably infer that car dealer Williams was talking about Defendant.  The charts prepared by Agent Szczepenski chronicling the numerous telephone calls between telephones registered to Defendant and the other alleged co-conspirators were additional evidence supporting the jury's verdict that Defendant had knowledge of the conspiracy.  Many of these telephone calls coincided with established events done in furtherance of the conspiracy.  Given this evidence, the reasonable inferences therefrom, and the Government's theory it was reasonable for the jury to conclude beyond a reasonable doubt that a conspiracy existed, that the defendant knew of the conspiracy, and that, with that knowledge, he voluntarily became

part of it.[11]

For the foregoing reasons, we AFFIRM the judgment of the District Court.

_____

[11] We also reject Defendant's contention that the jury should have been instructed on the "reasonable hypothesis" test. Our precedent makes clear that "it is not necessary to so instruct the jury when they are instructed properly on 'reasonable doubt.'" *United States v. Alonzo*, 681 F.2d 997, 1002 (5th Cir. 1982); *United States v. Cortez*, 521 F.2d 1, 4 (5th Cir. 1975). Since a proper reasonable doubt instruction was given by the district court in this case, the reasonable hypothesis instruction was unnecessary.