IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2008

Charles R. Fulbruge III
Clerk

No. 07-10602

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RONNIE WILLIAMSON

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

Ronnie Williamson was convicted of one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). He contends, inter alia, that the Government violated Batson v. Kentucky. We agree, reverse his conviction and remand for a new trial. In doing so, we reject Williamson's claim of insufficient evidence.

I

The events leading to Williamson's arrest and conviction grew out of a complaint to Child Protective Services regarding "drug endangered" children in the apartment where Williamson was staying. A CPS investigator, accompanied

by Fort Worth Police Department officers, went to the apartment to investigate the complaint. After receiving permission to enter the apartment, police officers saw what they thought was cocaine base on a bookshelf. While checking on the children, the CPA investigator and an officer saw marihuana in a bedroom. The officers obtained a search warrant, and during the subsequent search of the apartment, they discovered 90.89 grams of cocaine base and two digital scales in a container in Williamson's bedroom closet. Officers also found two handguns in the apartment. Williamson took responsibility for the drugs in his closet in a written statement,[1] and was charged with one count of possession with intent to distribute 50 grams or more of a controlled substance. The case proceeded to trial.

During its questioning of the venire panel, the district court asked whether "any member of the panel at any time [has] been involved in a criminal matter that concerns yourself, any member of your family, or a close friend, either as a defendant, a witness, or a victim?" The court also asked whether "any member of the panel had any experience involving yourself, any member of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics?" In response to these questions, thirteen members of the venire—including the only two black venire members—responded that they, a family member, or a close friend had some drug involvement.[2]

---

[1] Another person in the apartment admitted the drugs on the bookshelf were his.

[2] Venire members gave the following responses to the criminal matters question:

McNew: My soon-to-be ex-husband was convicted of a felony offense revolving around controlled substance prescriptions.
Court: Okay. Thank you. How long ago was that?
McNew: Two years ago.

Ceniceros: Uncle and a cousin convicted of narcotics.

Scarborough: I have two nephews, one who just now got out. He's out on probation. And I have another nephew that I legally adopted a few years back. Both of them are

The court allowed the parties to ask follow-up questions. The Government asked questions only of the black venire members, focusing on their

---

on - - drugs was their problem.
Court: Both of them are drug offenses?
Scarborough: Yes, sir.

Stembridge: My son-in-law's youngest son by his first marriage was convicted of unlawful use of his mother's vehicle. He received deferred adjudication, but he was sent to a drug facility in Winnsboro for treatment. He's clean since. . . .
   . . .
I just want to clarify my previous answer. My stepgrandson, although he was not convicted of drug possession, he was a crack cocaine addict and was sent to a rehab facility.

Massengale: . . . I've had two - - I've got a niece that's in jail right now for drugs and I've had a brother-in-law and a stepbrother in for narcotics, also.

O'Brien: My daughter has a felony conviction with narcotics.

In response to the court's drug question, venire members offered the following answers:

Wint: . . . I had a cousin that was convicted of drug distribution or something several years ago.

Cortez: Yes. I did use marihuana when I was a teenager.

Jones: My brother in his teenage years was caught by my parents, never arrested, with some type of drug.

Dukes: Yes, my sister and her husband were arrested but not tried for possession of marihuana, a very small amount for their own use that they were growing. And then I had a roommate that I came in on one day where he and his girlfriend were breaking up a brick of marihuana in the bottom drawer of their dresser. And I told them to get that stuff out of there.

Hooks (black venirewoman): I have several friends and relatives with children that have been convicted of drug use and also are still doing it.

Wilson (black venireman): Well, I know a few people that's actually - -
Court: Pardon?
Wilson: I know a few people that participate in drug use.
Court: Okay. Participated in what sense? In using them or distributing them?
Wilson: No, using them.

Vasquez: Marihuana as a teenager.

3

"associations" with persons who had drug involvement.[3] The defense asked a number of venire members follow-up questions, but none of those questions touched on drug issues.

The Government used peremptory strikes against the two black venire members. Williamson objected, arguing that the strikes were based on race in

---

[3] The following exchanges occurred between the Government and the black venire members:

Government: And I believe that you said that you know people who participate in drug use?
Wilson: Well, I think probably somebody - - everybody knows somebody, you know, a friend or family [member]. I got a family member and I know a few people that, you know, I don't know if it's a habit or what with them, you know. I don't see them. When I see them again, I may have heard, you know, hear stuff about they, you know . . .
Government: A family member? What family member? Would that be a close family member or an extended family member?
Wilson: Oh, extended family members. A cousin. I don't even - - I haven't seen him - - Well, probably I see him, you know, once a year maybe or, you know. We're not - - I mean, I'm kind of working on the road. I don't see him regularly. But, you know, when I have other times, sometimes, you know. You know, we have family functions, something or another, somebody from the family will, you know, give a report on what he's doing or, you know, something like that.
Government: Is there anything about having a family member which you have association with or friends that you have association with or friends that you have association with whom you know continue drug use that would color your opinion one way or the other in a prosecution where somebody is charged with drug sales or possession with intent to distribute drugs?
Wilson: No, I wouldn't say it would, no.

Government: I believe in response you said that you had several friend and relatives who were convicted of drugs and are still doing them?
Hooks: Yes. I know some - - well, step relatives that's been convicted of it and some that are still doing it, yes.
Government: You have any friends or close relations that are still - - that you know are still doing drug use?
Hooks: Yes.
Government: Do you associate with those individuals?
Hooks: Do I associate with them?
Government: Yes, ma'am.
Hooks: Yes, some are family and some are friends.
Government: Would there be anything with these individuals continuing their drug use after having been convicted that would color you opinion one way or the other in prosecution against someone for possession with intent to distribute drugs?
Hooks: No. I have to judge it on the individual.

4

violation of Batson. Although concerned whether Williamson made out his prima facie case, the court properly asked the Government to address the objection:

> Government: Your Honor, the reason that the government exercised its peremptory challenge against Potential Juror No. 23 and 24 is they're the only persons that the government is aware of on the panel who stated that they had friends and relatives. In one case with Ms. Hooks, she stated that she had friends and relatives that had been convicted of drug offenses and were still using drugs and that she associated with both the friends and the relatives.
>
> And, Mr. Wilson, Potential Juror No. 24, stated that he had both friends and relatives that used drugs and he continued to associate with those individuals. And the government - - As the Court is aware, this is a case in which the defendant is charged with possession with intent to distribute drugs, and the government does not believe those two individuals are appropriate to sit on the jury of this case.
>
> Court: What are you saying, that from what you learned that they appear to be people involved in the drug culture at this time?
>
> Government: They apparently condone the use of drugs by - - They have individuals who have - - associated with individuals who have been convicted and not sought help for the use of drugs or deterred the use of drugs, which certain other members of the jury stated that they had friends or relatives that had been convicted and sought rehab or had been convicted in the past. But no other juror on the panel stated that they knew and were associating with individuals that - -
>
> Court: Maybe that's because you didn't give them an opportunity to because you only asked those questions of the two black jurors.
>
> Government: Your Honor, I believe the answers - - Those individuals brought up those statements in response to questions that were asked by the Court in the original questioning.
>
> Court: I believe they did, too.

Government: And I was going into it again. I just didn't hear that response from any other juror. And the government would have exercised the same peremptory strike - - The government only exercised five strikes. The Government would have exercised another peremptory strike against any other member of the panel who had made the same responses to the Court's questions.

Defense: May I respond, Your Honor?

Court: Does the defendant have anything else to say?

Defense: Yes, Your Honor. I don't think that's accurate. I think - - I believe that they said that they knew people that used drugs and had acquaintances and perhaps family members, but I think it's clear the answers of other venire members that other members also had family members that had, in some cases, had even been prosecuted for drugs and some had - - I remember one venire member who said that their family member was actually "a crack addict." I believe that's how she referred to it. I certainly think that that shows - - and yet these two, Venire Members No. 23 and 24, simply said that they knew people. I don't think that they showed that they were actually involved in any kind of drug culture at all.

Court: I understood them to say that they were currently associating with persons who use illegal drugs, like family members and friends. I understood them to say that. I don't think I heard anyone else say that. The answer may be that they weren't asked those questions. But those two people did say that.
    I think the government has given me a neutral explanation that's not racially based for exercising those peremptory challenges, so I'll overrule your objection to those challenges.

The jury that was seated found Williamson guilty.

## II

Although of recent vintage, it is a fixed part of our constitutional landscape that "[t]he use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the

Fifth Amendment."[4]  Batson v. Kentucky[5] establishes a three-pronged inquiry to determine whether a peremptory challenge was based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.[6]

"We review the district court's conclusion on whether the peremptory strikes were racially motivated for clear error."[7]  We are mindful that "[t]he trial court has a pivotal role in evaluating Batson claims," and we afford its rulings—especially its credibility and demeanor determinations—due deference.[8]  But we are also cognizant that the Supreme Court has made plain that appellate review of alleged Batson errors is not a hollow act.[9]

The Government used its peremptory challenges to strike the only two black members of the venire, Williamson objected, and the Government provided an explanation.  Thus, the Government concedes that we are concerned only with the second and third steps Batson's inquiry, for "[w]here, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the

---

[4] United States v. Montgomery, 210 F.3d 446, 453 (5th Cir. 2000).

[5] 476 U.S. 79 (1986).

[6] Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008) (quoting Miller-El v. Dretke, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)) (internal quotations omitted).

[7] United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001).

[8] Snyder, 128 S. Ct. at 1208.

[9] See id. at 1212 (reversing the Louisiana Supreme Court); see also Miller-El v. Dretke, 545 U.S. at 266 (reversing this court); Miller-El v. Cockrell, 537 U.S. 322 (2003) (same).

question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the Batson analysis."[10]

Our review of the Government's proffered race-neutral explanation is de novo.[11] A race-neutral explanation is an "'explanation based on something other than the race of the juror.'"[12] The burden on the Government is "minimal" as "the explanation need not be persuasive, nor even plausible, but only race-neutral and honest."[13] We emphasize that "[a] per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters."[14]

The Government's race-neutral explanation for striking venire-persons Hooks and Wilson was that they were the only members of the venire who said that they knew, and were associating with, persons who were currently using drugs. The Government suggested that these associations indicated that Wilson and Hooks "apparently condone the use of drugs." The Government thus claimed to be concerned about their ability to serve on a jury in a prosecution for possession with intent to distribute a controlled substance. Viewed in isolation, the Government's explanation is race-neutral.[15]

However, the explanation falters upon closer examination. We begin with venireman Wilson. In response to the court's question, he stated that he "kn[e]w

---

[10] Williams, 264 F.3d at 571.

[11] Id.

[12] Id. (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)).

[13] Id.

[14] Miller-El v. Dretke, 545 U.S. at 247 n.6.

[15] See Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam) ("'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" (quoting Hernandez, 500 U.S. at 360)).

a few people that participate in drug use," specifically "using them." During the Government's questioning of him, Wilson explained that it was a cousin and a "few people" he knew. While the Government's concern with Wilson focused on his continued association with those people, Wilson's answers to the Government's questions are, at the least, ambiguous as to his associations, and more reasonably suggest that he had limited contact with those people. He stated that "I got a [cousin] and I know a few people that, you know, I don't know if it's a habit or what with them, you know. I don't see them. When I see them again, I may have heard, you know, hear stuff about they, you know . . . ."[16] That barely paints a picture of associating with the users. Wilson offered a more detailed explanation of his "association" with his cousin:

> I haven't seen him - - Well, probably I see him, you know, once a year maybe or you know. We're not - - I mean I'm kind of working on the road. I don't see him regularly. But, you know, when I have other times, sometimes, you know. You know, we have family functions, something or another, somebody from the family will, you know, give a report on what he's doing or, you know, something like that.

Wilson's contact with this cousin looks more incidental than intentional. It does not appear that the cousin attends the family functions regularly, and his answer certainly does not suggest Wilson has any kind of meaningful relationship with the cousin. Nor did Wilson otherwise suggest that he "condones" drug use. When asked if his "associations" would color his opinion, Wilson said that it would not. Wilson's answers undercut the Government's proffered explanation.

A comparison of the Government's treatment of Wilson with other members of the venire amplifies our suspicions. As the district court pointed out to the prosecutor, he elected to ask follow-up questions only of the two black

---

[16] Emphasis added.

members of the venire. The Government defended this decision below, as it does now, on the basis of the venire members' answers to the court's questions, that is, only Hooks and Wilson gave answers indicating a continued association with drug users. As to the other venire members, the Government below explained that "certain other members of the jury stated that they had friends or relatives that had been convicted and sought rehab or had been convicted in the past. But no other juror on the panel stated that they knew and were associating with individuals[.]"

Framed by the Government's concerns, at least four other members of the venire gave answers to the court's questions that should have also drawn the prosecutor's concern.[17] Venirewoman Ceniceros stated that she had an "[u]ncle and a cousin convicted of narcotics." Venirewoman Massengale answered that "I've had two - - I've got a niece that's in jail right now for drugs and I've had a brother-in-law and a stepbrother in for narcotics, also." Venirewoman O'Brien explained that "[m]y daughter has a felony conviction with narcotics." Finally, venireman Dukes stated that his "sister and her husband were arrested but not tried for possession of marihuana, a very small amount for their own use that they were growing."[18] The Government asked no follow-up questions of these

---

[17] Venire members McNew and Scarborough would be relevant but for the fact that they were struck for cause prior to the Government's questioning. Given the Government's concern that the black venire members "apparently condone the use of drugs," we also find it curious that the Government put no questions to the venire members who admitted using marihuana as teenagers. While the import of those venire members' answers was that they were not currently using drugs, their past experience has some facial bearing on their views of drugs prosecutions. Similarly, it is also curious that no follow-up questions were asked of venirewoman Stembridge, whose step-grandson, although now "clean," was at some point a crack addict who was sent to rehab; her experiences with him, again, would appear to have some facial bearing on her views of drug prosecutions.

[18] Venireman Dukes also stated that he "had a roommate that I came in on one day where he and his girlfriend were breaking up a brick of marihuana in the bottom drawer of their dresser. And I told them to get that stuff out of there." While the Government suggested at oral argument that this indicated that Dukes did not condone drug use, Dukes did not say why he wanted them "get that stuff out of there." Nor does it shed any light on Dukes'

venire members, and "the failure to ask undermines the persuasiveness of the claimed concern."[19] Nothing in these answers indicates that the drug activity was temporally remote or had stopped; a previous conviction or arrest does not mean that the person is not now using or otherwise involved with drugs. Indeed, venirewoman Massengale's niece was currently in jail on drug charges. Nor did these venire members state that they stopped associating with these persons, and there is no ground upon which to assume that they had stopped. While the Government's worry that Wilson would not be impartial in a drug prosecution in understandable, that its concern did not obtain with these venire members too is not. Any one of them may have had a negative view of drug prosecutions based on their family members' experiences. Compared to these venire members, Wilson's response to the court's question that he "know[s] a few people participating in drug use" was unexceptional.

Viewing the Government's proffered explanation for striking Wilson in light of his answers to the court's and the Government's questions, as well as the Government's treatment of the non-black venire members,[20] the explanation does not persuade. Although we do not have "persisting doubts as to the outcome," we will still "consider the strike of [Hooks] for the bearing it might have upon the strike of [Wilson]."[21] In response to the court's question, Hooks stated, "I have several friends and relatives with children that have been

---

associations with his sister and her husband, or his thoughts and feelings on their drug use and their drug arrests.

[19] Miller-El v. Dretke, 545 U.S. at 250 n.8.

[20] See Williams, 264 F.3d at 572 ("Thus, in circumstances where the Government's reason is fantastic or inconsistent with its treatment of similar non-minority jurors, we may have a basis for reversal." (emphasis added)); see also Miller-El v. Dretke, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.").

[21] Snyder, 128 S. Ct. at 1208.

convicted of drug use and are still doing it." Like Wilson, Hooks' answer differs little from the non-black venire members who described relationships with persons involved with drugs. Yet she was singled out for further questioning by the Government. In fact, her answer to the court's question suggests that the drug users were the children of her friends and family, and she did not say she was "associating" with those children. Standing alone there is nothing unreasonable about asking Hooks follow-up questions to clarify her answer, rather it is the failure to ask non-black venire members who gave similar answers that is troubling. During the Government's questioning, Hooks did state that she associated with friends and family who did drugs. Thus, while the Government's proffered explanation has more resonance to Hooks than Wilson in the end, its decision to single out Hooks for further questioning is problematic.

The Government's explanation for striking Wilson is unconvincing.[22] "The prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent."[23] We take the record as we find it, and conclude here that the district court clearly erred in overruling Williamson's Batson objection as to Wilson. We need not consider whether the court erred in overruling the objection to the Government's striking of Hooks.[24]

III

---

[22] See Miller-El v. Cockrell, 537 U.S. at 338-39 (explaining that "the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike"); Hernandez, 500 U.S. at 365 (plurality opinion) ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.").

[23] Snyder, 128 S. Ct. at 1212.

[24] See id. at 1208 ("Because we find that the trial court committed clear error in overruling petitioner's Batson objection with respect to Mr. Brooks, we have no need to consider petitioner's claim regarding Ms. Scott.").

Williamson also challenges the sufficiency of the evidence. Williamson properly moved for judgment of acquittal. We review the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility determinations in favor of the jury's verdict.[25] "If any rational trier of fact could have found proof of the essential elements of the crime beyond a reasonable doubt, the verdict will stand."[26]

Williamson argues that the Government failed to introduced sufficient evidence for the jury to find that he had an "intent to distribute." The Government had to prove at trial that Williamson (1) knowingly (2) possessed a controlled substance (3) with intent to distribute it.[27] "We have held in the past that the mere possession of a quantity of drugs inconsistent with personal use will suffice for the jury to find intent to distribute."[28] The value of the drugs is also evidence from which a jury can infer an intent to distribute.[29]

---

[25] United States v. Bishop, 264 F.3d 535, 549 (5th Cir. 2001).

[26] Id.

[27] United States v. Kates, 174 F.3d 580, 582 (5th Cir. 1999) (per curiam).

[28] United States v. Mays, 466 F.3d 335, 341 (5th Cir. 2006), cert. denied, 127 S. Ct. 1313 (2007); see also, e.g., Kates, 174 F.3d at 582 ("Intent to distribute may be inferred from the possession of a quantity of drugs too large to be used by the defendant alone. Possession of a small quantity of illegal drugs consistent with personal use does not support an inference of intent to distribute in the absence of other evidence, such as drug paraphernalia, guns, or large quantities of cash." (citations omitted)).

[29] See United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999) ("The intent to distribute may be inferred from the value and quantity of the substance possessed."); United States v. Vergara, 687 F.2d 57, 62-63 (5th Cir. 1982) ("The jury might also infer intent to distribute from evidence of the price of the heroin. Vergara's possession of five ounces of heroin, valued at approximately $8,500, thus gives rise to the inference of his intent to distribute." (citation omitted)); see also United States v. Williams-Hendricks, 805 F.2d 496, 501-02 (5th Cir. 1986) ("In the instant case, thirty-eight pounds of marijuana were confiscated from the vehicle. DEA agent Tittle testified that the contraband would be worth over $13,000. We are satisfied that the jury could infer Hendricks' intent to distribute from the quantity of marijuana seized.").

The Government urges that a rational juror could infer an intent to distribute from the quantity of drugs Williamson possessed. Williamson had 90.89 grams of cocaine base in his closet. Fort Worth Police Officer Brian Clark testified that a cocaine-base user would typically consume or smoke one-tenth of a gram at a time. He also explained that a user would generally purchase two-tenths of a gram at a time for personal use, which would cost about $20.00. Thus, the Government argues, the jury "could easily do the math" and determine that Williamson had some 900 personal use amounts in his closet with a street value of approximately $9,000—a quantity too large to be used by Williamson.

While the evidence that Williamson was distributing drugs is not overwhelming, we must conclude that it was sufficient. Jurors need not leave their commonsense on the courthouse steps. They could rationally accept that Williamson was both a drug user and a distributor, but that it was implausible that he would stockpile such a large quantity of drugs for his personal use, with its considerable cost and the increased risks attending such possession from police and outlaws. The two digital scales the police found in the container with the cocaine base also provides support to the conclusion that Williamson had an intent to distribute.

IV

We REVERSE the judgment of the district court, and REMAND for a new trial.