# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2010

No. 07-20689

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TYRONE MAPLETOFT WILLIAMS,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before KING, WIENER, and DENNIS, Circuit Judges.

KING, Circuit Judge:

In May 2003, Tyrone Mapletoft Williams, a commercial truck driver, transported 74 unlawful aliens from Harlingen, Texas, to Victoria, Texas. During the trip, he left the aliens locked in the trailer of his tractor–trailer without activating the trailer's air conditioning unit; as a result, 19 aliens died of dehydration, hyperthermia, suffocation, and mechanical asphyxia. Williams was convicted of 39 separate counts arising out of that trip. For the 20 counts that were capital charges, the Federal Death Penalty Act contemplated that the jury would determine the appropriate sentence if it first found a threshold intent that would justify imposing a sentence of death. The applicable threshold intent required that Williams have engaged in an "act of violence" in committing the

No. 07-20689

capital offenses. Following the district court's instructions, the jury found that Williams had committed the requisite act of violence but that he should be sentenced to life imprisonment. We conclude that the district court erred in its definition of act of violence and that, under the correct definition, the evidence at trial cannot support a finding that the requisite threshold intent was met. While we affirm Williams's convictions and his sentences to terms of years, we vacate his life sentences and remand for resentencing by the district court.

## I. BACKGROUND

### A. Factual Background

The tragedy giving rise to this prosecution originated in a South Texas alien-smuggling operation headed by Karla Chavez–Joya (Chavez). In 2003, Abelardo Flores, Jr., and his assistant, Fredy Garcia–Tobar (Garcia), were working for Chavez in the smuggling operation. Flores and Garcia were tasked with recruiting and paying truck drivers to transport unlawful aliens through border checkpoints. They placed a premium on truck drivers who were non-Hispanic and whose trucks were licensed in states other than Texas. Such drivers, they believed, were less likely to be scrutinized at checkpoints.

Tyrone Mapletoft Williams, a commercial truck driver, satisfied both of those criteria: he is black, and his tractor–trailer was licensed in New York. Flores and Garcia approached Williams in late April or early May 2003 in McAllen, Texas; Williams agreed to transport aliens from Harlingen, Texas, through the checkpoint at Sarita, Texas, and to deliver the aliens to other members of the smuggling operation in Robstown, Texas, for $6,500. Williams drove to the loading site in Harlingen, where he remained in the cab of his truck as other members of the operation loaded 60 aliens into the trailer and closed the trailer doors. After Williams cleared the Sarita checkpoint, he called Flores to provide an update. Williams then continued driving to Robstown, where the aliens were unloaded.

No. 07-20689

About a week later, Williams contacted Flores from New York about performing another smuggling trip.  They agreed in advance on payment of $7,500.  Before driving to Harlingen, Williams, who was accompanied by a female companion, Fatima Holloway, had to deliver a shipment of milk to San Antonio, Texas.   Williams's trailer was insulated and equipped with a refrigeration unit that maintained the milk shipment at 35 degrees Fahrenheit from New York; the trailer's refrigeration unit could operate even when the truck was turned off and even after being detached from the tractor portion of the truck.  Williams delivered the milk and drove to Harlingen on May 13, 2003, where Flores paid Williams the $7,500 in advance.  Flores offered to refuel Williams's truck before the trip, but Williams declined because he had enough fuel.

Sometime after 10:00 p.m., Williams and Holloway drove to the loading site, where Williams backed up the truck and turned off the headlights. Williams and Holloway remained in the cab as other members of the operation loaded 74 aliens into the trailer and closed the doors, which could not be opened from inside the trailer. Although Flores had advised Williams to set the trailer's temperature at 55 degrees Fahrenheit for the approximately 90-minute trip, at no point did Williams turn on the refrigeration unit.  At the Sarita checkpoint, Williams told an agent that the truck was empty and that he was driving to Houston to pick up a load of produce; the agent sent Williams through the checkpoint without inspecting the trailer because the trailer's refrigeration unit was turned off.  Two of the operation's members who had been following Williams did not experience such luck at the Sarita checkpoint.  They were supposed to collect the aliens at the drop-off site in Robstown, but they were each detained at the checkpoint for 30–60 minutes.  When he learned of this, Flores directed Williams to continue past Robstown and proceed with the aliens to Houston—over 200 miles past Robstown.

The aliens had remained silent through the Sarita checkpoint, but some time later, Holloway heard banging on the walls of the trailer. Although Williams pretended not to hear the banging at first, he admitted to Holloway that he heard it when it became louder. According to an eyewitness who was driving near Williams's truck, human arms were sticking out through holes in the trailer where lights had been, waving in distress. After Williams had passed the Sarita checkpoint, he pulled over in Riviera, Texas, in response to being signaled by another truck driver. After seeing the damage the aliens were causing to his trailer, Williams began cursing angrily and contacted Flores to demand more money. Williams also ignored Holloway's pleas to let the aliens out of the trailer. He resumed driving and stopped in Refugio, Texas, shortly after midnight, where he purchased several bottles of water. Williams again resumed driving and stopped at a truck stop near Victoria, Texas, shortly after 1:30 a.m. He made several trips inside to purchase water, which he placed into holes that had been made in the trailer; he then instructed Holloway to purchase water as well. On the last of these trips, Holloway saw a shirtless Hispanic male enter the truck stop and begin speaking to the clerk in Spanish. The clerk called the police, and Holloway walked back outside. As Williams escorted her back into the cab of the truck, she observed that the trailer's doors were open, but she did not see into the trailer. Williams had disengaged the tractor from the trailer, and he drove away, abandoning the trailer and the aliens at the truck stop.

Law enforcement and paramedics arrived at the truck stop shortly thereafter. The scene they encountered was horrific and gruesome. There were several dead bodies on the ground by the trailer doors. Bodies, both dead and living, were stacked in a pile in the trailer. Some of the aliens were standing behind the pile. The aliens were stripped down to their underwear and were sweating. They had clawed at the foam on the inside of the trailer, and the trailer smelled of vomit, urine, feces, and blood. Seventeen of the trailer's 74

No. 07-20689

passengers died at the scene and another two died at the hospital from a combination of dehydration, hyperthermia, suffocation, and mechanical asphyxia.  The victims included two children, ages five and fifteen.

## B.    Procedural Background

On March 15, 2004, a multi-count superseding indictment charged Williams[1] with 58 counts alleging violations of 8 U.S.C. § 1324(a)(1).[2]  Count 1

---

[1] The indictment also charged 13 codefendants, but those charges are not at issue in this appeal.

[2] The applicable portions of that statute provide:

(A) Any person who—

. . . .

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v)     (I) engages in any conspiracy to commit any of the preceding acts, or

(II) aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

(i) in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both;

. . . .

No. 07-20689

(conspiracy) charged him with conspiracy to harbor and transport unlawful aliens for private financial gain, causing serious injury to a person, placing in jeopardy the life of a person, and resulting in the death of a person.[3]  Counts 2 through 20 (harboring) each charged him with aiding and abetting the harboring of unlawful aliens for private financial gain, causing serious injury to a person and placing in jeopardy the life of a person.[4]  Counts 21 through 39 (noncapital transporting) each charged him with aiding and abetting the transporting of unlawful aliens for private financial gain, causing serious bodily injury and placing in jeopardy the life of a person.[5]  Counts 40 through 58 (capital transporting) each charged him with aiding and abetting the transporting of unlawful aliens for private financial gain, causing serious injury to a person, placing in jeopardy the life of a person, and resulting in the death of a person.[6]  The Government simultaneously filed a notice of intent to seek the death penalty against Williams under the Federal Death Penalty Act of 1994 (FDPA), 18

---

(iii) in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of Title 18) to, or places in jeopardy the life of, any person, be fined under Title 18, imprisoned not more than 20 years, or both; and

(iv) in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under Title 18, or both.

8 U.S.C. § 1324(a)(1).

[3] The conspiracy count alleged a violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(A)(iii), and (a)(1)(A)(v)(I), punishable under 8 U.S.C. § 1324(a)(1)(B)(i), (a)(1)(B)(iii), and (a)(1)(B)(iv).

[4] The harboring counts alleged violations of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(A)(v)(II), punishable under 8 U.S.C. § 1324(a)(1)(B)(i) and (a)(1)(B)(iii).

[5] The noncapital transporting counts alleged violations of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II), punishable under 8 U.S.C. § 1324(a)(1)(B)(i) and (a)(1)(B)(iii).

[6] The capital transporting counts alleged violations of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II), punishable under 8 U.S.C. § 1324(a)(1)(B)(i), (a)(1)(B)(iii), and (a)(1)(B)(iv).

No. 07-20689

U.S.C. §§ 3591–3598.

Trial proceeded against Williams on all counts and ended in a mistrial.[7] Following appeal and remand, the case was retried. On December 4, 2006, the jury returned a verdict of guilty on the conspiracy, noncapital transporting, and capital transporting counts.[8] The capital counts then proceeded to a separate sentencing hearing before the jury, as mandated by the FDPA. *See* 18 U.S.C. §§ 3591(a) & 3593(b)(1). At the sentencing hearing, the Government bore the burden of proving beyond a reasonable doubt at least one of four possible threshold intents. *See* 18 U.S.C. § 3591(a)(2). The only threshold intent submitted to the jury was whether Williams "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2)(D). Over Williams's objection, the district court submitted the following instructions regarding "act of violence":

> To find that this threshold intent requirement is satisfied as to each of Count One and Counts Forty through Fifty-Eight, you must unanimously find that the prosecution has proven beyond a reasonable doubt each of the following: that Mr. Williams intentionally and specifically committed an act of violence; that Mr. Williams actually knew that the act created a grave risk of serious

---

[7] This is the fourth time this case has come before us. The first two were interlocutory appeals relating to discovery matters. *See In re United States* (*Williams I*), 397 F.3d 274 (5th Cir. 2005) (per curiam) (granting the Government's mandamus request on a discovery matter); *United States v. Williams* (*Williams II*), 400 F.3d 277 (5th Cir. 2005) (per curiam) (granting the Government's request under collateral order appeal or mandamus to avoid discovery sanction). The third appeal was from a judgment of mistrial on the conspiracy and harboring counts and conviction on a partial jury verdict on the transporting and capital transporting counts. *See United States v. Williams* (*Williams III*), 449 F.3d 635 (5th Cir. 2006). In *Williams III*, we vacated the district court's judgment on the jury verdict and remanded for new trial and reassignment to a new district judge. *Id.* at 647–48.

[8] The jury also returned a verdict of guilty on the harboring counts, but the district court dismissed those counts on the Government's motion.

bodily injury or death to a person; that committing the act of violence constituted a reckless disregard for human life; and that one or more of the individuals died as a direct result of the act of violence.

An "act of violence" is an act, that by its nature, creates a grave risk of serious bodily injury to a person or a grave risk of death to a person. An "act of violence" is one that inherently carries a grave risk of seriously injuring or killing a person. In deciding whether the prosecution has met its burden of proving the threshold intent requirement beyond a reasonable doubt, you are to base your decision on the acts that Mr. Williams committed, and not on the acts of any other person or persons.

For the conspiracy count and each of the capital transporting counts, the jury answered that Williams had committed such an act of violence.

The jury was then tasked with weighing aggravating factors for which the Government had provided notice against any mitigating factors. *See* 18 U.S.C. §§ 3591(a), 3592(a) & (c), 3593. The statutory aggravating factors submitted for each capital count were that Williams, in committing the offense, knowingly created a grave risk of death to one or more persons other than the victim, *see* 18 U.S.C. § 3592(c)(5), and that he committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim, *see* 18 U.S.C. § 3592(c)(6). For each of the two capital transporting counts involving underage victims, a third aggravating factor was submitted based on the victims being particularly vulnerable due to youth. *See* 18 U.S.C. § 3592(c)(11). The jury answered that the grave risk of death aggravating factor was present on each count, that the especially heinous commission aggravating factor was absent on each count, and—on the two counts for which the it was submitted—that the vulnerable victim aggravating factor was present.[9]  The

---

[9] With respect to the nonstatutory aggravating factors, the jury unanimously found that Williams: (1) was likely to commit criminal acts of violence in the future that would be a danger to the lives and safety of other persons; (2) made the victims vulnerable by transporting them in a sealed container that they could not open; and (3) caused significant

jury recommended that Williams should be sentenced by the district court to a term of years on the conspiracy count and to a term of life imprisonment without possibility of release on each of the capital transporting counts. *See* 18 U.S.C. §§ 3593(e) (authorizing the jury, after finding a threshold intent present, to recommend a sentence of death, life imprisonment without possibility of release, or a lesser sentence) & 3594 (requiring the district court to sentence a defendant to death or life imprisonment without possibility of release upon the jury's recommendation).

For the conspiracy and noncapital transporting counts, a presentence investigation report (PSR) was prepared. The PSR recommended an offense level of 42 and a criminal history category of I under the 2004 version of the U.S. Sentencing Guidelines Manual ("U.S.S.G." or the "Guidelines"). This included a nine-level enhancement under U.S.S.G. § 2L1.1(b)(2)(C) for transporting 100 or more unlawful aliens and an upward departure of eleven levels under § 5K2.1 for the numerous deaths. The district court adopted the PSR's recommendation: on the conspiracy count, Williams was sentenced to 405 months' imprisonment followed by five years' supervised release; on the noncapital transporting counts, Williams was sentenced to the statutory maximum of 240 months' imprisonment followed by three years' supervised release. All sentences, including the life sentences imposed on each capital transporting count, were to run concurrently,

---

injury, harm, and loss to the families of the victims. With respect to the mitigating factors, the jury found that: (1) equally culpable codefendants were not sentenced to death; (2) Williams was a minor participant in the events leading to the victims' deaths; (3) Williams is a hardworking, good, and caring person; (4) Williams cooperated with the authorities; (5) executing Williams would adversely impact his wife and family; (6) Williams has shown and continued to show remorse for his wrongs; (7) there is a strong likelihood that Williams can be rehabilitated; (9) Williams had adapted well to incarceration; (10) Williams poses no future threat to society; (11) the incident was out of character for Williams and was an isolated incident; and (12) Williams acted under the substantial domination of Flores. The only mitigating factor submitted that the jury failed to find was that Williams had no significant prior criminal history.

as were the two terms of supervised release.

Williams timely appealed.

## II. DISCUSSION

Williams argues first that we should reverse his convictions and remand for new trial because the Government unconstitutionally struck a venireperson on account of race. He then levels three challenges to his sentence. Regarding the capital counts, Williams claims that the district court erred in its definition of "act of violence" under the applicable threshold intent of the FDPA and that insufficient evidence was presented to warrant a sentencing phase before the jury. He then argues that the district court erred in its sentencing-phase jury instruction regarding the aggravating factor based on vulnerability of two victims. Finally, with respect to the counts on which he was sentenced by the district court, Williams claims that the district court improperly applied a sentencing enhancement based on the number of unlawful aliens he transported. We address these arguments in turn.

## A.    Batson Challenge

Williams first argues that the Government unconstitutionally exercised a peremptory challenge to strike venireperson Lawrence Allen, an African–American, on the basis of his race. Williams claims that the district court's denial of his challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), was reversible error warranting a new trial. The Government responds that the race-neutral reasons it articulated below for striking Allen withstand appellate scrutiny.

"[I]t is a fixed part of our constitutional landscape that 'the use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment.'" *United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008) (alteration omitted) (quoting *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir.

2000)).  In determining whether a peremptory challenge was impermissibly based on race, a district court must undertake a three-step analysis:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (quotation marks and alterations omitted) (quoting *Miller–El v. Dretke* (*Miller–El II*), 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)).

This case implicates only the third step of *Batson*.  "Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the *Batson* analysis."  *See United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001) (citing *United States v. Broussard*, 987 F.2d 215, 220 n.4 (5th Cir. 1993), *abrogated on other grounds by J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994)).  Furthermore, Williams does not dispute that the Government offered a race-neutral basis for striking Allen. *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (addressing only the third step of *Batson* where the first two steps were not disputed); *see also Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam) ("The second step of this process does not demand an explanation that is persuasive, or even plausible.").  Our review is therefore limited to assessing the district court's determination that Williams failed to show purposeful discrimination.  In undertaking this review, we are mindful that "[t]he trial court has a pivotal role in evaluating *Batson* claims," *Snyder*, 552 U.S. at 477, and, accordingly, "we afford its rulings—especially its credibility and demeanor determinations—due deference." *Williamson*, 533 F.3d at 274 (citing *Snyder*, 552 U.S. at 477).  That deference

11

requires us to "'review the district court's conclusion on whether the peremptory strike[ ] w[as] racially motivated for clear error.'" *Id.* (quoting *Williams*, 264 F.3d at 571). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (alteration and internal quotation marks omitted) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

During voir dire of the entire venire panel, Allen raised his hand in response to two questions asked by the district court, one relating to whether the members of the venire had opinions about smuggling illegal aliens into the United States and another asking whether the venire had any preconceived opinions about Williams's guilt.  During Allen's individual voir dire, the Government asked follow-up questions regarding those responses.  Regarding his response to having a preconceived opinion about Williams's guilt, Allen answered that he had heard "a little bit" about the case from the news but that nothing from the news coverage had caused him to reach any conclusions as to the guilt of anybody involved in the case.  Allen explained that he had raised his hand because he had heard "certain things" from "people on the street" "that [Williams] might be guilty," but that he would have to "hear the evidence first to make sure."  Regarding his response to the district court's question about smuggling aliens into the United States, Allen clarified that he held strong opinions about "illegals working in th[is] country" "but not dealing with this case."

The Government also asked Allen about responses he had given on his written questionnaire.  In one of those responses, Allen had selected, from several possibilities, that he felt the death penalty was "applied unfairly against certain racial or ethnic groups."  He explained that in the 1960s or '70s, some of his friends had been arrested and charged with (non-death penalty) crimes in

Florida after dating white women, but that he did not know whether the death penalty was presently applied unfairly against certain racial or ethnic groups. In another, he stated that his sister was arrested once because of her race but that it would not cause him to favor either side in Williams's case. In a third response, Allen indicated that he would automatically choose one punishment over the other if given a choice of imposing a term of imprisonment or the death penalty, but he explained that he would base that determination on the facts at trial.[10] Allen reiterated that, as a juror, he would base his decision on the evidence and would follow the court's instructions.

At that time, neither party moved to strike Allen for cause. Later on, the Government exercised a peremptory challenge and struck Allen, and Williams objected on *Batson* grounds. In response to Williams's *Batson* challenge, the Government offered the following race-neutral reasons for striking Allen: (1) he presumed Williams's guilt; (2) he was noncommittal in response to voir dire questioning; (3) he expressed a belief that the death penalty was unfairly applied to certain ethnic or racial groups, alluding to an event in the 1960s or '70s in which friends of his were arrested and charged with crimes after dating white women; (4) his sister had been arrested on account of her race; (5) he indicated on his juror questionnaire that he would automatically choose one sentence over another; and (6) he stated on his questionnaire that the death penalty is never justified. Williams countered that many white venirepersons had been noncommittal or inconsistent during voir dire and argued that the Government's reasons were pretext for purposeful discrimination based on Allen's race.

Before it denied Williams's *Batson* challenge, the district court confirmed

---

[10] Allen's explanation was as follows:

The reason I was saying that is because you're giving me the option of which one that we have to determine. I would look at all the facts and then with the jury will make that decision as far as—because of the penalty phase that this person lives. Then we'll make that judgment.

No. 07-20689

the demographic composition of the impaneled jury as compared to the venire. Nine African–Americans were qualified for the jury pool, and the Government exercised peremptory strikes on five of them. Of the remaining four, three were on the main panel, while one was an alternate, meaning that three of the twelve jurors on the main panel—or 25%—were African–American.[11] The court explained to the parties that the statistics did not support a finding of purposeful discrimination: "There were 13.6 percent [African–Americans] in the venire, and there are 25 percent on the panel." The district court rejected Williams's contention that the Government's justification was belied because other venirepersons had given noncommittal or inconsistent answers, as that particular objection was broad enough to apply to virtually every venireperson.[12] Accordingly, the district court found that there was no "basis for inferring purposeful discrimination" and concluded that the Government "ha[d] credibly established the reasons for the peremptory strike being exercised" on Allen.

---

[11] In an earlier hearing, the district court had explained that 34 of the venire's 250 members—or 13.6%—were African–American, a proportion that exceeded the 11.04% overall rate for the Houston Division of the Southern District of Texas.

[12] The district court stated:

[Defense counsel]'s argument essentially applies to every—the problem with your argument . . . is that you can find so many—there were so many answers given, either to the questionnaire, to oral questions, the group, as well as individually, that you could find some basis on which to say as to everybody who was the subject of the challenge, while there was someone who was outside of that person's group who was not removed on the basis—on that basis.

My point is that it's extraordinarily difficult, given the wealth of information of data points of responses, to pick out one and say: Well, somebody who was not black gave a similar response to that one question, but that person is on the panel. Or that person. And so, it's a race-based justification.

Obviously, there are some—some—some responses that you could imagine, some proffered basis that certainly could be either inherently discriminatory or would not be credible, that would support a *Batson* challenge, but you can't pick one answer to one question, take it out of context and say: Well, this non-black person answered that same question the same way, and they're on the panel; and, therefore, there's discrimination.

14

No. 07-20689

On appeal, Williams points to the individual voir dire of two other venirepersons—Kathleen Cox and Lawrence Selph—who, he contends, gave similar answers as Williams but were not struck by the Government because they were not African–American. He contends that the district court erred in rejecting his "comparator" argument based on the size of the venire because such reasoning would prevent comparison analysis whenever a large venire was assembled. The Government responds by reasserting the race-neutral grounds it offered to the district court and emphasizing our deferential standard of review.[13]

We agree with the Government that our deferential standard of review disposes of Williams's *Batson* claim. The Government's articulated reasons for striking Allen are supported by the voir dire transcripts. Of course, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller–El II*, 545 U.S. at 241 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). However, Williams's comparisons of Allen to Cox and Selph are not persuasive. Cox stated that she had read about the case and "d[id] not understand how someone could treat people so cruelly." However, she explained that she realized during voir dire that the media coverage may have

_____

[13] The Government also argues that Williams's comparison analysis should be reviewed only for plain error. It claims forfeiture because, although Williams raised a comparison argument before the district court, he did not specifically identify Cox and Selph as comparison venirepersons. We disagree that a *Batson* challenge requires such specificity. In *Miller–El II*, the Court engaged in just such a comparison on habeas review, notwithstanding that those comparisons were not made before the state courts. 545 U.S. at 241 n.2; *see also Snyder*, 552 U.S. at 483 (warning appellate courts to be cautious in making "retrospective comparison[s]" that were not explored below but not prohibiting the approach). The Government cites several cases to support its assertion of plain error review here, but in none of those cases had the appellant made a comparison argument during voir dire, as Williams did here. In any event, our conclusion that the district court did not err in denying Williams's *Batson* challenge renders the plain error issue irrelevant.

15

been inaccurate and that she was not referring to any particular "someone"; she assured the district court that she would be able to disregard any knowledge she already had about the case and base her decision solely on the evidence presented.[14]  Unlike Allen, Cox did not give any inconsistent answers regarding the death penalty.  Selph, during his individual voir dire, asserted that he would follow the law and could impose the death penalty if it was the appropriate punishment.  When asked about his response on the questionnaire that he knew the death penalty was unfairly applied against certain racial or ethnic groups, he explained that he believed there was unfair treatment based on what he had read about criminal cases.  That belief, he stated, would not cause him to be partial to either side, even though he knew that Williams is black.[15]  As was the case with Cox, there is nothing to suggest that Selph was inconsistent in his answers about imposing the death penalty.[16]

"[T]he question presented at the third stage of the *Batson* inquiry is whether the defendant has shown purposeful discrimination." *Snyder*, 552 U.S. at 484–85 (internal quotation marks omitted) (quoting *Miller–El II*, 545 U.S. at 277).  In light of the demographic composition of the jury and the differences between Allen's voir dire responses and those of Cox and Selph, we discern no clear error in the district court's finding that Williams had failed to show

---

[14] Williams challenged Cox for cause, but the district court denied that challenge. Williams later exercised a peremptory challenge to strike Cox.

[15] Williams did not examine Selph after the Government concluded its questioning. Neither party challenged Selph for cause, and neither party exercised a peremptory challenge to strike him.  Selph served as an alternate juror.

[16] We are unconvinced by Williams's contention that the district court rejected a comparison analysis because of the large size of the venire.  The district court rejected Williams's specific comparisons, not the concept of comparison generally, stating that "you can't pick one answer to one question, take it out of context and say: Well, this non-black person answered that same question the same way, and they're on the panel; and, therefore, there's discrimination."

purposeful discrimination.

## B.    Threshold Intent

Williams's next challenge is to the jury instructions regarding the threshold intent rendering him death eligible. Under the FDPA, conviction of an offense punishable by death is followed by a separate sentencing hearing—the "selection phase," *Jones v. United States*, 527 U.S. 373, 381 (1999)—at which aggravating and mitigating factors are considered. *See* 18 U.S.C. §§ 3592 & 3593(b)(1). At the selection phase, the jury may recommend a sentence of death, life imprisonment without possibility of release, or a lesser sentence determined by the district court. 18 U.S.C. § 3593(e). However, before such a recommendation may be made, the jury must first address the "eligibility phase" and unanimously find beyond a reasonable doubt at least one of four threshold intents[17] and at least one statutory aggravating factor rendering the defendant eligible for a death sentence. *See* 18 U.S.C. §§ 3591(a)(2), 3592(c) & 3593(e)(2); *Jones*, 527 U.S. at 376, 381. In Williams's case, the sole threshold intent submitted to the jury during the eligibility phase was that contained in 18 U.S.C. § 3591(a)(2)(D), which provides:

---

[17] The requisite threshold intent exists when it is found beyond a reasonable doubt that the defendant:

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act . . . .

18 U.S.C. § 3591(a)(2).

No. 07-20689

> A defendant who has been found guilty of any . . . offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593 . . . intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act, shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified . . . .

18 U.S.C. § 3591(a)(2)(D) (internal numbering omitted).

The FDPA does not contain a definition for what constitutes an act of violence. During the eligibility phase, the jury was instructed that:

> An "act of violence" is an act, that by its nature, creates a grave risk of serious bodily injury to a person or a grave risk of death to a person. An "act of violence" is one that inherently carries a grave risk of seriously injuring or killing a person. In deciding whether the prosecution has met its burden of proving the threshold intent requirement beyond a reasonable doubt, you are to base your decision on the acts that Mr. Williams committed, and not on the acts of any other person or persons.

Earlier, the district court had asked the parties whether the instruction should also include the following additional language:

> An act of violence is any act that involves the use, attempted use, or threatened use of physical force against the person of another, creating a grave risk of serious injury to a person—or to that person or a grave risk of death to that person.

The Government objected to the additional language, and Williams objected to its absence. Ultimately, the district court concluded that the additional language was unnecessary.

Williams argues on appeal that the act of violence instruction erroneously permitted the jury to find him death eligible without requiring that the act involve the use of physical force. He claims that under a correct definition, the

jury would have had insufficient evidence to establish the requisite act of violence, and we should vacate the life sentences and remand for sentencing by the district court. In contrast, the Government endorses the definition adopted by the district court and contends that the jury correctly found that Williams engaged in an act of violence. We first address the definition of act of violence before turning to whether Williams engaged in such an act of violence.

## 1.    Defining "Act of Violence"

Ordinarily, we review a jury instruction for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury. *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009). Under this standard, "[w]e consider whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *Id.* (internal quotation marks omitted) (quoting *United States v. Orji–Nwosu*, 549 F.3d 1005, 1006 (5th Cir. 2008)). However, when a jury instruction hinges on a question of statutory construction, our review is de novo. *United States v. Guevara*, 408 F.3d 252, 257 (5th Cir. 2005) (citing *United States v. Ho*, 311 F.3d 589, 605 (5th Cir. 2002)); *United States v. Morales–Palacios*, 369 F.3d 442, 445 (5th Cir. 2004) (citing *Ho*, 311 F.3d at 605).

The threshold intent at issue in this case—18 U.S.C. § 3591(a)(2)(D)—consists essentially of three elements. It requires first that the defendant have "intentionally and specifically engaged in an act of violence." 18 U.S.C. § 3591(a)(2)(D). Second, the defendant must have done so "knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life." *Id.* Finally, the "victim [must have] died as a direct result of the act." *Id.* Our inquiry is limited to the first element, and more specifically to the phrase "act of violence." At the outset, we note that the modifying words "of violence" must be given meaning. This is

true because of the precept of statutory construction that effect should be given to every clause and word of a statute, *see Moskal v. United States*, 498 U.S. 103, 109 (1990) (noting the "established principle that a court should give effect, if possible, to every clause and word of a statute" (internal quotation marks omitted) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))), and also because the FDPA itself distinguishes between an "act," 18 U.S.C. § 3591(a)(2)(C), and an "act of violence," 18 U.S.C. § 3591(a)(2)(D). *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))); *see also United States v. Baskerville*, 491 F. Supp. 2d 516, 521 (D.N.J. 2007) (noting the distinction between "act" and "act of violence" and concluding that "Congress expressly narrowed subsection (D) to acts of a particular quality, namely, violent acts").

Because the FDPA does not define "act of violence," we must "give the phrase its ordinary meaning." *Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010) (citing *Bailey v. United States*, 516 U.S. 137, 144–45 (1995), *superseded by statute on other grounds as described in United States v. O'Brien*, — S. Ct. —, 2010 WL 2025204 (May 24, 2010)). We are not without guidance in ascertaining the ordinary meaning of the phrase "act of violence." The Supreme Court, in the context of the Armed Career Criminal Act (ACCA),[18] recently examined the

---

[18] The relevant section provides:

[T]he term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

　(i) has as an element the use, attempted use, or threatened use of

ordinary meaning of the word "violent":

> Even by itself, the word "violent" in § 924(e)(2)(B) connotes a substantial degree of force. Webster's [New International Dictionary] 2846 [(2d ed. 1954)] (defining "violent" as "moving, acting, or characterized, by physical force, esp. by extreme and sudden or by unjust or improper force; furious; severe; vehement . . ."); 19 Oxford English Dictionary 656 (2d ed. 1989) ("characterized by the exertion of great physical force or strength"); Black's [Law Dictionary] 1706 [(9th ed. 2009)] ("of, relating to, or characterized by strong physical force"). When the adjective "violent" is attached to the noun "felony," its connotation of strong physical force is even clearer. See [Black's Law Dictionary] 1188 (defining "violent felony" as "a crime characterized by extreme physical force, such as murder, forcible rape, and assault and battery with a dangerous weapon"); see also *United States v. Doe*, 960 F.2d 221, 225 ([1st Cir.] 1992) (Breyer, C.J.) ("The term to be defined, 'violent felony,' . . . calls to mind a tradition of crimes that involve the possibility of more closely related, active violence[.]").

*Johnson*, 130 S. Ct. at 1271 (alterations omitted); *see also Begay v. United States*, 553 U.S. 137, 148 (2008) (construing the second clause of the ACCA's definition of "violent felony" as connoting "violent and aggressive crimes committed intentionally"). The *Johnson* Court's discussion indicates that physical force is an indispensable aspect of the word "violent."[19] Nothing in the *Johnson* Court's

---

> physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B).

[19] Prior to *Johnson*, the Court had alluded to the ordinary meaning of the term "crime of violence," as defined in the Comprehensive Crime Control Act of 1984, as suggesting that physical force would be required. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004). According to the *Leocal* Court:

> [W]e cannot forget that we ultimately are determining the meaning of the term "crime of violence." The ordinary meaning of this term, combined with § 16's emphasis on the use of physical force against another person (or the risk of having to use such force in committing a crime), suggests a category of violent, active crimes . . . .

analysis indicated that its definition of "violent" was limited to the ACCA.  For our purposes, in the context of the FDPA, that analysis compels our conclusion that an "act of violence" must necessarily entail at least some use of physical force.

The legislative history to 18 U.S.C. § 3591(a)(2)(D) indicates the provision's purpose as authorizing death sentences under the circumstances of *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).[20]  In *Enmund*, the Court considered the constitutionality of imposing a death sentence on a defendant who was acting as the getaway driver for two robbers who killed their victims when the victims put up armed resistance.  458 U.S. at 784.  The Court rejected the notion that the Eighth Amendment would "permit[] imposition of the death penalty on one . . . who aids and abets a felony

---

*Id.*

[20] The pertinent legislative history provides:

To be eligible for the death penalty, the defendant must have intentionally killed the victim, intentionally inflicted serious bodily injury resulting in the victim's death, intentionally participated in an act contemplating that a person's life would be taken and the victim died as a result, or intentionally engaged in an act of violence when such participation constituted reckless disregard for human life and the victim died as a result of the conduct.  The intentional participation and "reckless disregard for human life" standards stem from the Supreme Court's holdings in the cases of *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987).

The Committee understands these cases to hold that under certain particularly heinous circumstances, the Constitution permits the application of the death penalty where the defendant acted with a state of mind short of an intent to kill or in circumstances where an intent to kill can be imputed to the defendant.  These circumstances can include situations in which the defendant intentionally and substantially participated in actions that resulted in a death and where the defendant's participation in an act of violence constituted extreme reckless indifference for human life.  The Committee believes that the reckless indifference standard is appropriate, on both policy and constitutional grounds, when a defendant may not necessarily have had an actual intent to kill, but engaged in an act of violence that manifested an extreme and reckless indifference for human life and resulted in death.

H.R. REP. NO. 103–466, at 15 (1994).

in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797. Nonetheless, the *Enmund* Court hedged by noting that "[i]t would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." *Id.* at 799.

In *Tison*, the Court again addressed the permissibility of sentencing a defendant to death where the defendant lacked the specific intent to kill. There, three brothers amassed an arsenal and broke their father and his cellmate out of prison. 481 U.S. at 139. During their lam through the Arizona desert, they stole a vehicle and forced its occupants—a man, his wife, their two-year-old son, and fifteen-year-old niece—to drive deeper into the desert. *Id.* at 140. Once they stopped, the Tison father and his cellmate lined the carjacking victims up in front of their escape vehicle while the Tison brothers walked toward the victims' vehicle; the Tison brothers then witnessed the victims being killed with repeated shotgun blasts before all five men fled in the victims' vehicle. *Id.* at 140–41. The Supreme Court found that the petitioners—two of the Tison brothers—could constitutionally be sentenced to death because "their degree of participation in the crimes was major rather than minor, and the record would support a finding of the culpable mental state of reckless indifference to human life." *Id.* at 151. The Court explained that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement," *id.* at 158, because "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state . . . that may be taken into account in making a capital sentencing judgment," *id.* at 157–58.

The Government argues that the FDPA's legislative history demonstrates that 18 U.S.C. § 3591(a)(2)(D) was intended to comport with *Enmund* and *Tison*

23

and thus "permits a death sentence, or in this case, a life sentence imposed under the FDPA, for a reckless state of mind." We take no issue with this argument. *See United States v. Bourgeois*, 423 F.3d 501, 508 (5th Cir. 2005) ("[T]he Eighth Amendment is not a *per se* bar to imposition of the death penalty when the murderer possessed only a reckless state of mind." (citing *United States v. Webster*, 162 F.3d 308, 322 (5th Cir. 1998))). While *Enmund* and *Tison* concluded that the Eighth Amendment requires major participation in a felony combined with reckless indifference to human life to warrant a death sentence under the felony-murder doctrine, they did not speak in terms of an "act of violence" as the FDPA does. Our task is not to wrestle with the constitutional requirement of culpability but instead with the statutory requirement that the reckless indifference to human life be manifested in an "act of violence." Neither the legislative history of FDPA nor the Supreme Court precedent it references counsels against a construction of that phrase that requires the use of physical force.[21]

In conclusion, we hold that an "act of violence," for purposes of 18 U.S.C. § 3591(a)(2)(D), must involve the use of physical force. The jury instructions during the eligibility phase defined an "act of violence" as "an act, that by its nature, creates a grave risk of death to a person" and "inherently carries a grave risk of seriously injuring or killing a person." While this definition correctly identifies one of the qualities of the "act" prescribed by 18 U.S.C. § 3591(a)(2)(D)—that it create a grave risk of death—it failed to identify another required quality—that the act be one "of violence." We interpret that latter

---

[21] Williams also argues that the doctrine of lenity requires a construction of the term "act of violence" that requires physical force. The doctrine of lenity requires courts to resolve ambiguous statutes in favor of criminal defendants. *Moskal*, 498 U.S. at 107–08. Lenity is not necessary to our holding in Williams's favor, and we consequently do not rely on it. We do recognize, however, that construing the term "act of violence" to require the use of physical force is consistent with the doctrine of lenity.

quality to require that the act involve the use of physical force, and we accordingly conclude that the eligibility-phase jury instructions erroneously permitted the jury to find the required threshold intent with less than 18 U.S.C. § 3591(a)(2)(D) requires.

## 2.    Sufficiency of the Evidence

After concluding that an act of violence is one that entails physical force, we must next confront the proper remedy for the erroneous jury instruction. In response to our request for supplemental briefing, both Williams and the United States indicated their agreement that remand to the district court for sentencing under the Guidelines—rather than for a new sentencing hearing before the jury—would be proper if we were to find reversible error in the instruction defining act of violence. However, they offer different reasons for why that is the proper course of action. Williams argues that we should review the sufficiency of the evidence offered at trial and find that no rational trier of fact could have found that he engaged in the requisite act of violence. The Government disclaims the need for a sufficiency inquiry because the jury's recommendation that Williams be sentenced to life imprisonment without possibility of release constituted an acquittal of a sentence of death. Because the Government concedes that it is barred by the Fifth Amendment's Double Jeopardy Clause[22] from again seeking the death penalty, the FDPA and its concomitant sentencing hearing are no longer involved in the case, and any resentencing would necessarily be done by the district court sitting without a jury.[23] This rationale assumes that a penalty-phase sentencing hearing by a jury is available only if

---

[22] "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V.

[23] Williams, in his supplemental brief, argues alternatively that the FDPA and its bifurcated jury sentencing structure cease being applicable if we find reversible error in the threshold intent instruction because he was acquitted of a death sentence.

all three possible sentences—death, life imprisonment, or a term of years—are available for the jury to recommend.

We have not yet confronted whether the FDPA contemplates a sentencing hearing at which the jury's sole choice is between recommending a sentence of life imprisonment without possibility of release or a term of years to be determined by the district court, and we do not do so today. In a typical case in which we found reversible error, we would address an argument regarding sufficiency of the evidence to avoid the possibility of double jeopardy. *See United States v. Moses*, 94 F.3d 182, 188 (5th Cir. 1996) ("In cases where the reversal permits the Government to retry the defendant, we must reach a sufficiency of the evidence argument because the Government may not retry the defendant if the evidence at trial was insufficient." (citing *United States v. Meneses–Davila*, 580 F.2d 888, 896 (5th Cir. 1978))); *accord United States v. Rodriguez*, 260 F.3d 416, 423 (5th Cir. 2001) (citing *Moses*, 94 F.3d at 188; *Meneses–Davila*, 580 F.2d at 895). It is clear that double jeopardy principles bar the Government from seeking the death penalty against Williams on remand because the jury unanimously recommended that he be sentenced to a term of life imprisonment without possibility of release. *See Arizona v. Rumsey*, 467 U.S. 203, 211 (1984) ("[R]espondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment . . . . That judgment, based on findings sufficient to establish legal entitlement to the life sentence, . . . bars any retrial of the appropriateness of the death penalty."). It is less clear what the appropriate remedy is under the FDPA when a life sentence is recommended by the jury during a penalty-phase sentencing hearing that was reached in error: remand for a new jury recommendation—limited to exclude death as an option—or a Guidelines sentence by the district court. However, we need not and do not reach this question because we conclude that the evidence is

insufficient to support a finding of the requisite threshold intent.

In conducting a review for sufficiency of the evidence, we ask whether a rational trier of fact could have found the disputed facts beyond a reasonable doubt. *See United States v. Broadnax*, 601 F.3d 336, 343 (5th Cir. 2010); *United States v. Sampson*, 486 F.3d 13, 47 (1st Cir. 2007) (applying the rational juror standard to FDPA aggravating factors).[24] "'In applying this standard, we view the evidence in the light most favorable to the prosecution and accept all reasonable inferences that tend to support the verdict.'" *Broadnax*, 601 F.3d at 343 (quoting *United States v. Ekanem*, 555 F.3d 172, 174 (5th Cir. 2009)).

The Government articulated its act of violence theory during a November 2006 hearing:

> It's not that he was transporting them in a refrigerated trailer. That wasn't the act of violence. It was the fact that once he was made aware that these people wanted out and they were desperate—and they were in desperate straits, he intentionally and specifically decided not to open those doors because he didn't want to get caught. That's the act of violence. That's where the rubber meets the road, you know; and the fact that he continued to keep them held hostage inside that refrigerated trailer from that point on was a continuing act of violence or act of violence against them.

On appeal, the Government presses the same theory, arguing that Williams's act of violence consisted of "his intentional refusal to turn on the refrigeration unit and intentional refusal to let the aliens out of the trailer."

These omissions, while callous and ultimately devastating, do not involve

---

[24] We note also that error in a jury instruction under the FDPA may be harmless. *See* 18 U.S.C. § 3595(c)(2) ("The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless."); *Sampson*, 486 F.3d at 33 ("In a capital case, as in any other case, a confusing instruction may be harmless." (citing *Boyde v. California*, 494 U.S. 370, 383–84 (1990)). Our conclusion that the evidence is insufficient to support a finding of the requisite threshold intent yields a necessary corollary that the error in defining "act of violence" was not harmless.

the use of physical force as contemplated by the act of violence requirement in 18 U.S.C. § 3591(a)(2)(D).  The evidence presented at trial was clear that the aliens were loaded by others involved in the smuggling operation while Williams remained in the cab of his truck.  Merely driving the tractor–trailer does not constitute the use of physical force in the relevant sense.  *See Dalton v. Ashcroft*, 257 F.3d 200, 206 (2d Cir. 2001) ("The physical force used cannot reasonably be interpreted as a foot on the accelerator or a hand on the steering wheel.  Otherwise, all driving would, by definition, involve the use of force, and it is hard to believe that Congress intended for all felonies that involve driving to be 'crimes of violence.'").  And although Williams continued driving and left the aliens trapped in the trailer without air conditioning even after he realized their plight, the evidence does not show that he exerted physical force against the aliens themselves.  The only evidence of Williams's interactions with them was in passing bottles of water through the holes in the trailer—an act that cannot sensibly be categorized as violent.  None of the testimony suggests that Williams even spoke to the aliens after opening the trailer doors, let alone used physical force against them at the time.  Because the evidence was insufficient as a matter of law to support a finding that Williams engaged in the requisite act of violence, the threshold intent question should not have been submitted to the jury, and sentencing should have been done by the district court.

In support of its theory that Williams's refusal to release the aliens or turn on the refrigeration unit was the act of violence, the Government cites *Dickson v. Ashcroft*, 346 F.3d 44 (2d Cir. 2003).  In that case, the court was tasked with determining whether unlawful imprisonment accomplished by deception was a crime of violence under 18 U.S.C. § 16, and it addressed a hypothetical situation that had been presented at oral argument:

> [A] defendant lures a victim to enter a room voluntarily, and then locks the door, leaving the victim imprisoned.  Dickson argued that

such an act would be unlawful imprisonment by deception, but would not involve the use or risk of force.  We cannot agree that such an act does not involve confining the victim by force—even though there has been no application of violent force, the defendant has unquestionably, by locking the door, imposed physical barriers of forcible restraint.

*Id.* at 49.  Unlike in *Dickson*, however, here it is undisputed that Williams did not impose any such barriers—other members of the smuggling operation loaded and sealed the trailer.

Williams's conduct during the smuggling trip, despicable as it was, fell short of the statutory minimum to subject Williams to the possibility of a death sentence.  We therefore remand for resentencing by the district court.  Because our remand is to the district court for resentencing, we do not decide whether the FDPA would condone a sentencing hearing before a jury not empowered to recommend a sentence of death.

## C.    Aggravating Factor

Williams next argues that the jury instructions during the sentencing hearing regarding the vulnerable victim aggravating factor under 18 U.S.C. § 3592(c)(11) were improper.  He concedes that he did not preserve this claim by objecting below and that our review is for plain error.  However, this aggravating factor becomes relevant only during the selection phase by the jury.  *See* 18 U.S.C. §§ 3591(a)(2)(D) & 3592.  Because we are remanding for sentencing by the district court, we need not address Williams's claims of error during the selection phase before the jury.

## D.    Sentence Calculation

Williams next asserts that the district court erred in its application of a sentencing enhancement based upon the number of unlawful aliens he transported.  For the conspiracy and noncapital transporting counts, Williams

was sentenced by the district court.[25]   Over Williams's objection, the district court adopted the recommendation of the PSR that the sentences on those counts include nine-level enhancements under § 2L1.1(b)(2)(C) of the Guidelines.[26] That section applies "[i]f the offense involved the smuggling, transporting, or harboring of six or more unlawful aliens."   U.S.S.G. § 2L1.1(b)(2).   Section 2L1.1(b)(2) provides for different level increases depending on the number of unlawful aliens smuggled, transported, or harbored; a six-level enhancement applies if the number is 25 to 99, U.S.S.G. § 2L1.1(b)(2)(B), and a nine-level enhancement applies if the number is 100 or more, U.S.S.G. § 2L1.1(b)(2)(C). The district court concluded that the nine-level enhancement applied because Williams had transported approximately 60 unlawful aliens in late April or early May 2003, just prior to the 74 he transported on May 13–14, 2003; the district court considered both trips to be "relevant conduct" for purposes of applying the sentencing enhancement, and the combined number of unlawful aliens transported during those trips exceeded 100.   *See* U.S.S.G. § 1B1.3.   Williams claims the district court erred in including the number of unlawful aliens transported during the first trip because that trip was not alleged in the superseding indictment.[27]

We review a district court's interpretations of the Guidelines de novo and its factual findings for clear error.   *United States v. Longstreet*, 603 F.3d 273, 275–76 (5th Cir. 2010).   A district court's determination of the number of

---

[25] Although the conspiracy count was a capital charge and was submitted to the jury during the sentencing phase of trial, the jury determined that the appropriate sentence was a term of years to be imposed by the district court.

[26] The district court applied the 2004 version of the Guidelines, and we do so as well. We note that the relevant provisions in the current version of the Guidelines do not differ in any material respect.

[27] On appeal, Williams does not press any other challenge to the district court's sentences on the conspiracy and transportation counts.

unlawful aliens attributable to a defendant under § 2L1.1(b)(2) is a factual finding that we review for clear error, *see United States v. Angeles–Mendoza*, 407 F.3d 742, 750 (5th Cir. 2005), as is the "determination of what constitutes relevant conduct for sentencing purposes," *United States v. Nevels*, 160 F.3d 226, 229 (5th Cir. 1998) (citing *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996)).  This deferential standard requires only that the finding be "'plausible in light of the record as a whole.'" *United States v. Miller*, — F.3d —, —, 2010 WL 1903639, at *2 (5th Cir. 2010) (quoting *Ekanem*, 555 F.3d at 175).

The Guidelines provide several ways in which conduct may be considered relevant conduct.  Of course, relevant conduct includes "acts and omissions committed . . . by the defendant" "during the commission of the offense of conviction."  U.S.S.G. § 1B1.3(a)(1)(A).  When there is a jointly undertaken criminal activity, relevant conduct also extends to "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).  In addition, relevant conduct includes, "with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts,[28] all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  Two or more offenses may constitute part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."  U.S.S.G. § 1B1.3 cmt. n.9(A).[29]

---

[28] Section 3D1.2(d) includes offenses covered by § 2L1.1.

[29] "Commentary contained in U.S.S.G. application notes is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'" *Miller*, — F.3d at —, 2010 WL 1903639, at *3 n.2 (quoting *United States v. Johnston*, 559 F.3d 292, 295 n.4 (5th Cir. 2009)).

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.

U.S.S.G. § 1B1.3 cmt. n.9(B).

For § 1B1.3(a)(2) to apply, it is not necessary that "the defendant, in fact, . . . have been convicted of multiple counts." U.S.S.G. § 1B1.3 cmt. n.3. The commentary provides the following two examples:

> For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales.
>
> . . . For example, the defendant sells 30 grams of cocaine (a violation of 21 U.S.C. § 841) on one occasion and, as part of the same course of conduct or common scheme or plan, attempts to sell an additional 15 grams of cocaine (a violation of 21 U.S.C. § 846) on another occasion. The defendant is convicted of one count charging the completed sale of 30 grams of cocaine. The two offenses . . . are of a character for which § 3D1.2(d) would require the grouping of counts, had the defendant been convicted of both counts. Therefore, subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level.

*Id.*

It was not clear error for the district court to include Williams's first trip, during which he transported approximately 60 unlawful aliens, as part of the relevant conduct for applying § 2L1.1(b)(2). Ample evidence supports a conclusion that the two trips were part of a common scheme or plan. The same

accomplices—Flores, Garcia, and Chavez—were involved in both trips, and Flores's testimony established the number of aliens transported during the first trip. Both trips were for the purpose of transporting aliens and were undertaken with the same *modus operandi*—unlawful aliens were loaded into Williams's trailer in Harlingen, driven through the Sarita checkpoint, and unloaded (unsuccessfully in the second trip) in Robstown. The Guidelines requirement to establish a common scheme or plan is satisfied here because the offenses are "substantially connected to each other by at least one common factor." U.S.S.G. § 1B1.3 cmt. n.9(A); *accord United States v. Miller*, 179 F.3d 961, 966 (5th Cir. 1999) (noting that "at least one" factor "is required to infer a 'common scheme or plan'"); *see also United States v. Fernandez–Pena*, 128 F. App'x 380, 381 (5th Cir. 2005) (per curiam) (finding no clear error in adding the number of unlawful aliens transported on two trips separated by 20 months where the two trips shared a similar *modus operandi*).[30] Accordingly, the district court did not commit clear error in enhancing Williams's sentences by nine levels under § 2L1.1(b)(2)(C).

## III. CONCLUSION

Williams has failed to establish error under *Batson*; because he presses no other error affecting the guilt phase of his trial, we AFFIRM his convictions for counts 1 (conspiracy), 21–39 (noncapital transporting), and 40–58 (capital transporting). We conclude that the district court erred in its definition of "act of violence" under the Federal Death Penalty Act, and we further determine that the evidence was insufficient to establish the required threshold intent. Because sentencing should have been done by the district court and not the jury, we VACATE the life sentences imposed on the capital transporting counts, and we REMAND for resentencing by the district court on those counts. The district

---

[30] Because the two trips were part of the same scheme or plan, we do not address whether they comprise part of the same course or conduct.

No. 07-20689

court did not commit clear error in calculating the number of unlawful aliens Williams transported, and, accordingly, we AFFIRM Williams's sentences on the conspiracy and noncapital transporting counts.

AFFIRMED IN PART; VACATED IN PART; REMANDED.