# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 29, 2026

Lyle W. Cayce
Clerk

No. 25-50510

United States of America,

*Plaintiff—Appellee*,

*versus*

Jhonaker Manuel Arrieta,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:25-CR-381-5

Before Smith, Willett, and Ramirez, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Six detainees at an Immigration & Customs Enforcement (ICE) facility in El Paso knotted bed sheets, towels, and shirts into a makeshift rope and climbed to an unrailed roof two stories above the ground. For more than three and a half hours they refused every command to come down, demanding release and media attention and "threaten[ing] to jump off" if officers came near. The standoff broke only after the facility summoned two specialized law-enforcement teams and the Special Response Team fired sublethal munitions. The cost was a six-hour lockdown that suspended dining

and all facility activities and cut off detainees' access to their attorneys and families.

Arrieta pleaded guilty to mutiny, in violation of 18 U.S.C. § 1792, and the only question on appeal is how the Sentencing Guidelines classify what he did. Section 2P1.3 sets three base offense levels, and this case turns on the middle one, which applies when "the offense involved a major disruption to the operation of an institution." The district court so found. On this record, that finding was not clearly erroneous. We AFFIRM.

I

A

Arrieta, a Venezuelan citizen with no authorization to enter or remain in the United States, was held at the El Paso Service Processing Center while he awaited removal. On January 27, 2025, as other detainees diverted the officers, Arrieta and five others knotted towels, bed sheets, and shirts into an improvised rope and used it to climb onto the canopy roof above the recreation area. The roof stands "approximately the height of a two-story building" and has no secured rim. Video captured the six "climbing on the canopy, placing t-shirts around their faces, and refusing repeated commands from [guards], ICE agents, and staff to come down[.]" They demanded release and media attention. When officers approached, they "threatened to jump off."

On-site staff could not end the standoff alone. For more than two and a half hours, the El Paso Crisis Negotiation Team tried to talk the detainees down. When that failed, the El Paso Special Response Team deployed sublethal munitions, and only then did the detainees descend by ladder. Their descent did not end the disruption. The facility stayed on total lockdown for six hours—canceling activities, turning away visitors and counsel, and serving a satellite dinner because regular dining was unavailable.

No. 25-50510

B

A grand jury charged Arrieta and the five other detainees with mutiny, in violation of 18 U.S.C. § 1792. Arrieta pleaded guilty. The applicable Guideline, U.S.S.G. § 2P1.3, covers "engaging in, inciting or attempting to incite a riot involving persons in a facility for official detention."[1] It assigns three base offense levels:

> (1) 22, if the offense was committed under circumstances creating a substantial risk of death or serious bodily injury to any person;
>
> (2) 16, if the offense involved a major disruption to the operation of an institution;
>
> (3) 10, otherwise.[2]

The presentence report recommended the top tier, level 22, on the ground that the offense risked death or serious bodily injury.[3] Arrieta objected, urging the residual level of 10. In the alternative, counsel acknowledged that level 16 "would be the next most applicable [G]uideline." That tier applies when the offense "involved a major disruption to the operation of an institution."[4] The Government, like the probation office, pressed for level 22, arguing the detainees risked serious injury if they fell.

The district court chose the middle tier. It set the base offense level at 16 and sentenced Arrieta to fifteen months' imprisonment, three years of supervised release, and a $100 special assessment. Arrieta timely appealed.

---

[1] *See* U.S.S.G. § 2P1.3.

[2] *Id.*

[3] *Id.* § 2P1.3(a)(1).

[4] *Id.* § 2P1.3(a)(2).

3

## II

The district court had jurisdiction under 18 U.S.C. § 3231.[5] We have jurisdiction under 28 U.S.C. § 1291.[6]

"We review a district court's interpretations of the Guidelines de novo and its factual findings for clear error."[7] And "[a] factual finding is not clearly erroneous if it is plausible in light of the whole record."[8]

## III

### A

The Government urges waiver and invited error, seizing on counsel's description of level 16 as "the next most applicable [G]uideline." Neither theory holds.

Arrieta did not abandon his request for level 10 by naming level 16 as a fallback. His written objection sought the residual level under § 2P1.3(a)(3) and invoked level 16 only in the alternative. At sentencing, counsel made the point explicit: she did "not want to waive [her] objection" to level 10 and wished to "hold on to all those good arguments [she] made in [the] written objections." That preserved both the result she sought and the grounds for it.[9]

---

[5] 18 U.S.C. § 3231 (covering "all offenses against the laws of the United States").

[6] 28 U.S.C. § 1291.

[7] *United States v. Williams*, 610 F.3d 271, 292 (5th Cir. 2010).

[8] *United States v. Blanco*, 27 F.4th 375, 382 (5th Cir. 2022) (citation omitted).

[9] *See* FED. R. CRIM. P. 51(b) ("A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.").

No. 25-50510

Nor did Arrieta invite the ruling he now challenges. Invited error reaches only errors attributable to the defense's own conduct.[10] Even then, we reverse only to prevent "manifest injustice."[11] Arrieta did not ask for level 16; he argued for level 10 and named level 16 only as a fallback.

## B

The merits question is narrow: Did the district court clearly err in finding that Arrieta's offense "involved a major disruption to the operation" of the detention facility? We have not construed that phrase before.[12]

We read the Guidelines by "the typical rules of statutory interpretation."[13] Here the inquiry begins and ends with ordinary meaning.[14]

"Major" means "important, serious, or significant,"[15] and "disruption" means a "disturbance or problems that interrupt an event,

---

[10] "A defendant may not complain on appeal of errors that he himself invited or provoked the district court to commit." *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014) (alterations omitted) (quoting *United States v. Wells*, 519 U.S. 482, 487–88 (1997)).

[11] *Id.*

[12] Previously, we considered a challenge to the base offense level under U.S.S.G. § 2P1.3(a)(1)—the highest base offense level for those offenses that "create[e] a substantial risk of death or serious bodily injury to any person." *United States v. Gonzalez-Alvidres*, 281 F. App'x 351, 353–54 (5th Cir. 2008) (per curiam) (quoting U.S.S.G. § 2P1.3(a)(1)). However, we face for the first time the meaning of "major disruption to the operation of an institution" under § 2P1.3(a)(2).

[13] *United States v. Stanford*, 883 F.3d 500, 511 (5th Cir. 2008).

[14] *See id.*

[15] *Major*, NEW OXFORD AMERICAN DICTIONARY 1055 (3d ed. 2010); *see also Major*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1059 (5th ed. 2022) ("Greater than others in importance . . . [g]reat in scope . . . very serious").

activity, or process."[16] The provision does not reach every interruption in institutional life. It reaches a "major disruption *to the operation* of an institution."[17]

Arrieta minimizes the episode as a non-violent protest—"something like a sit-in." He emphasizes that the detainees "employed no violence or threats of violence" and "did not encourage any other inmates to use violence, to take over control of the facility, or even to join their protest." The six-hour lockdown, he says, was a mere "administrative disruption," no different from a closure "due to bad weather . . . or if repair work was being done at the facility." But he does not dispute what the lockdown interrupted: "visitation, attorney-client visits[,] and meal services."

That argument cannot be reconciled with the Guideline's three-tier structure. The middle tier turns on the disruption's operational magnitude—not on whether the conduct can be labeled "violent" or "run-of-the-mill." On Arrieta's premise that every mutiny shuts a facility down, level 10 would have almost nothing left to do. The premise also misdescribes this episode. Whatever a "plain vanilla run-of-the-mill mutiny" looks like, this was not it.

The record gave the district court ample support. Six detainees climbed to a roof "approximately the height of a two-story building" with no secured rim. Video showed them "placing t-shirts around their faces, and refusing repeated commands from [guards], ICE agents, and staff to come down[.]" For more than three and a half hours they held the roof and "threatened to jump off" if officers approached. The facility called in the

---

[16] *Disruption*, New Oxford American Dictionary, *supra*, at 503; *see also Disrupt*, The American Heritage Dictionary of the English Language, *supra*, at 522 ("To throw into confusion or disorder . . . [t]o interrupt or impede").

[17] U.S.S.G. § 2P1.3(a)(2) (emphasis added).

Crisis Negotiation Team, then the Special Response Team; only sublethal munitions ended the standoff. And the consequence was no minor reshuffling of the day's schedule: the facility locked down for six hours, canceling activities, suspending regular dining, and closing off visitors and legal counsel.

That is a major disruption. The facility's operations did not pause for weather or repairs; they stopped because a prolonged, coordinated rooftop standoff consumed specialized personnel and had to be ended by force. The Guideline asks no more. It does not require an assault, a takeover, or a separate showing of substantial risk of serious injury—and reading those demands into the middle tier would collapse it into the top one. The district court could readily find this episode "important, serious, or significant."

Arrieta's authorities do not point the other way. *United States v. Kramer* addressed a § 5K2.7 departure for disruption of a governmental function after an attempted helicopter escape; it neither construed nor applied § 2P1.3(a)(2).[18] Its account of an extraordinary escape sets no threshold here. *United States v. Doyle* runs the other way: the Fourth Circuit upheld a level-16 finding under § 2P1.3(a)(2) after a two-hour disturbance that involved multiple fires, heavy smoke, danger to officers, and forced removals, emphasizing both the operational consequences and the duration.[19]

That suffices. We need not map the precise boundary between levels 10 and 16. A three-and-a-half-hour rooftop standoff that required two specialized units and sublethal munitions—and then shut down the facility for six hours—sits comfortably within § 2P1.3(a)(2)'s ordinary meaning of a

---

[18]  943 F.2d 1543, 1547, 1550 (11th Cir. 1991) (per curiam).

[19]  No. 95-5456, 1996 WL 85117, at *3 (4th Cir. Feb. 29, 1996) (per curiam) (unpublished).

No. 25-50510

"major disruption." Because the district court's finding "is plausible in light of the whole record," it is not clearly erroneous.[20]

AFFIRMED.

_____

[20] *Blanco*, 27 F.4th at 382.